# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-01-00211-CV

---

**Houston Livestock Show and Rodeo, Inc., Appellant**

**v.**

**T. L. Hamrick, Connie S. Hamrick, Leslie Hamrick, Craig Barton, Jacque Barton, Jimmy Barton and Kevin Copeland, Appellees**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. 92-14826, HONORABLE MARY PEARL WILLIAMS, JUDGE PRESIDING**

---

## O P I N I O N

Appellant Houston Livestock Show and Rodeo, Inc. (the "Livestock Show") appeals from a judgment awarding appellees Leslie Hamrick and her parents, T.L. Hamrick and Connie Hamrick; Jimmy Barton and his parents, Craig Barton and Jacque Barton; and Kevin Copeland,[1] damages for violations of the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Civ. Prac. & Rem. Code Ann. §§ 17.01-.63 (West 2002); mental anguish; loss of reputation; defamation; attorney's fees; and as to Leslie Hamrick, loss of prize money.

---

[1] For convenience we will refer to appellees collectively as "appellees"; we will refer to Leslie Hamrick, Jimmy Barton, and Kevin Copeland as "Exhibitors," unless individual differentiation is required.

Appellees sued the Livestock Show and the Texas Veterinary Medical Diagnostic Laboratory (the "Lab") alleging breach of contract, conversion, negligence, gross negligence, defamation, intentional or reckless infliction of emotional distress, and DTPA violations. The jury returned a favorable verdict for appellees against the Livestock Show for the DTPA violations and defamation, as well as negligence and gross negligence against the Lab. The jury, however, found absence of malice as to the Livestock Show's defamatory statements. Additionally, the jury found that the Lab had not received timely notice of the claims against it under the Texas Tort Claims Act, and that Copeland had failed to file his suit against the Lab within the tort claims act's two-year statute of limitations. *See id*. §§ 101.001-.109 (West 1997 & Supp. 2003). Accordingly, the district court rendered judgment against the Livestock Show for approximately $1.5 million but rendered a take-nothing judgment against the Lab. The Livestock Show brings this appeal by sixteen issues, challenging the: (1) district-court judgment as against public-policy; (2) timeliness of Copeland's claims; (3) consumer status of the parents; (4) violation of the DTPA; (5) existence of a producing cause of the DTPA damages; (6) injury-to-reputation damages; (7) recovery of mental-anguish damages; (8) recovery of Leslie Hamrick's prize money; (9) existence of "knowing" violation; (10) recovery of "additional" damages under DTPA for knowing violation; (11) nonsegregation of attorney's fees and appellate attorney's fees; (12) defamation finding; (13) negligence and gross negligence finding against the Lab; (14) and (15) overruling of the Livestock Show's objection to appellees' expert witness; and (16) district court's venue determination. We will reform the district-court judgment and, as reformed, affirm.

2

# I. Factual and Procedural Background

In 1991 Leslie Hamrick, Jimmy Barton, and Kevin Copeland, all high-school students, entered farm animals they had raised in the Junior Livestock Show competition at the Livestock Show. They vied with other competitors in various animal classes for a chance at winning the contest and auction proceeds from the sale of their animals. As prescribed by Livestock Show rules, the Exhibitors were members of their schools' FFA or 4-H programs, operating under the guidance of the Texas Education Agency (the "TEA"). Their FFA and 4-H programs, and to a certain extent their parents, supervised the Exhibitors' raising of their animals. Hamrick and Barton entered lambs, and Copeland entered a steer in the Junior Livestock Show.[2] Each won their respective class, entitling them to participate in the Livestock Show's junior auction. The competition's rules required the animals to undergo drug testing for illegal substances, commonly used to improve an animal's appearance. The drug tests revealed illegal substances in all three

---

[2] The Houston Livestock Show and Rodeo is a nonprofit corporation that conducts an annual livestock show and rodeo. In 1991 the Livestock Show was held from February 16 to March 3. That year the Livestock Show promulgated two sets of rules: (1) General Rules and Regulations, and (2) Junior Livestock Show Special Rules. The Junior Livestock Show's Special Rules stated the junior division's purpose as "encourag[ing] and promot[ing] the educational aspects of livestock projects conducted only by junior exhibitors under the proper supervision and direction of either an Agricultural Science Teacher or of a County Extension Agent." The opportunity for 4-H and FFA students to enter the junior livestock show was through an Agricultural Science Teacher or County Extension Agent only.

animals, and the Livestock Show disqualified the Exhibitors.[3] This action arises from the drug testing procedures and the Livestock Show's actions toward appellees.

Junior Livestock Show rule 16 states that "unethically fitted livestock" are prohibited, and exhibitors showing such animals would be disqualified and "barred from future competition" at the Livestock Show.[4] The Livestock Show instituted animal drug testing to "teach and reward 4-H and FFA students for good animal husbandry," while "endeavor[ing] to protect the public from consuming tainted meat."[5] Moreover, the rule warned exhibitors that the Livestock Show's drug test results were final and without recourse.

Livestock Show applications and entry fees submitted by Agricultural Science Teachers and County Extension Agents included the signature of both instructor and exhibitor. The reverse side of each application included a waiver of liability and a statement notifying the signatories that the Livestock Show had the right to test the animals for medication or drugs. Below this statement, the application contained lines on which the exhibitor and the exhibitor's parent or guardian signed. The exhibitors and their parents or guardians also signed and returned a notarized

---

[3] The Livestock Show began drug testing show animals in 1989. The Livestock Show was one of the first in the nation to introduce this type of "residue avoidance" program. In 1991 the Livestock Show tested 194 animals for illegal substances. Eight initially tested positive, which included the Exhibitors'. After a second round of testing, three animals were exonerated, which included Copeland's steer and Barton's lamb.

[4] The rules define "unethically fitting" as "consist[ing] of any method altering the natural conformation of any part of the animal's body." It is not uncommon for participants to improve the animal's appearance. Appearance is an important factor in judging an animal's fitness for prizes and auction price. Some fitting practices are allowed, while others result in disqualification. Illegal fitting can endanger the animal while alive, as well as endanger its value as a food source after slaughter. FDA and USDA rules prohibit the use of certain substances in food animals.

[5] Livestock Show animals were sold for human consumption.

4

form stating that they would abide by the rules, and that no unauthorized substances had been given to the animals.[6] In the event an animal required testing, the exhibitor and his or her parent or guardian would witness the collection of a urine specimen from the animal and sign another form acknowledging that they were present for the collection. Pending a successful drug test, the prizes and auction proceeds, less the Livestock Show's commission, would be disbursed.

Appellees paid the appropriate entry fees and submitted their applications. Each won ribbons in their respective class, entitling them to participate in the auction. At auction, Hamrick's lamb brought $12,020, Barton's lamb brought $1520, and Copeland's steer brought $5060. Pursuant to its drug testing rules, the Livestock Show obtained a urine sample from Barton's lamb on February 27. The next day, the Livestock Show collected urine samples from Hamrick's lamb and Copeland's steer. The Livestock Show split the samples into two parts, with the Lab testing one half, while the Livestock Show retained and froze the remainder. The Lab tested the specimens following the auction, and the Livestock Show retained the auction proceeds pending review of the results.[7]

The Livestock Show selected the Lab, located at Texas A&M University, to test the urine samples. The testing procedures involved two different sets of tests: one set to detect lasix or furosemide, and another to detect clenbuterol.[8] Two sections of the Lab were involved in the

---

[6] The form states that the animals had not received any nonapproved FDA or USDA substances, and that the animals would not be "within any withdraw time relative to the administration of any drug, chemical, or feed additive approved by the FDA and/or USDA by the time the animal(s) is officially weighed in by the [Livestock] Show."

[7] Rule 3 states: "[a]ll sale money will be withheld if, after slaughter, the animal is found to have been tampered with or altered."

[8] Lasix is a diuretic, which, when given to animals, reduces the amount of water in the animal's body. With less water retention, the animal appears and feels firmer to the judge. Lasix

5

animals' drug testing. To detect lasix, the drug testing section conducted an enzyme-linked immunosorbent assay ("ELISA") screening test, after which the toxicology section conducted a high-performance liquid chromatography ("HPLC") confirmatory test. The Lab used the ELISA test to screen a large number of samples, narrowing the field by indicating which samples required a more detailed analysis. In 1991 the Lab selected a then-existing ELISA test to screen animal urine for lasix. The ELISA tests conducted on Hamrick's and Barton's samples indicated the likely presence of lasix, which triggered the need for a confirmatory test. The toxicology section then conducted the HPLC with fluorescence. The HPLC indicated the presence of lasix in both samples.[9]

The Lab employed a different test to screen the urine samples for clenbuterol. This test was specifically designed by the Lab and used only that year. In 1991 clenbuterol was first making an appearance in livestock show animals as a way to improve their appearance. Accordingly, the Livestock Show allocated funds to the Lab for development of a screening test capable of detecting clenbuterol. The Lab's head of toxicology, Dr. John Reagor, along with a "Dr. Spainhauer," developed a procedure utilizing the Lab's gas chromatograph with flame ionization detection to detect the presence of clenbuterol in animal urine. The procedure was represented to have been adapted from current scientific literature. This test confirmed the presence of clenbuterol in Copeland's steer.

---

is used to reduce swelling in animals and is used in race horses to reduce bleeding in the lungs caused by the stress of racing. Clenbuterol is a substance that can accelerate the growth of an animal's muscle mass. Both substances are prohibited for use in show animals.

[9] The flourescene test is actually two separate tests, involving the HPLC machine. The tests measure the retention time and flourescene response of the sample.

Following the confirmatory testing, the Lab, on March 10, reported to the Livestock Show that Hamrick's lamb had tested positive. Nine days later, the Lab reported that Barton's lamb and Copeland's steer had both tested positive as well. Thereafter, the Livestock Show notified the Exhibitors and their schools that they had been disqualified because of the positive drug tests.[10] Additionally, the Livestock Show informed appellees that they were barred from participating in Houston Livestock Shows for the remainder of their lives.

After disqualification, appellees contacted the Livestock Show, inquiring about the circumstances surrounding the disqualifications. The Hamricks and Bartons retained counsel, while the Copelands personally corresponded with the Livestock Show. The attorney for the Hamricks and Bartons requested that the remaining urine samples be tested at another lab. On April 11 and 29, the Livestock Show responded that it was willing to submit the remaining samples to a "mutually agreed testing laboratory." After some discussion concerning a mutually agreeable lab, the Livestock Show's counsel sent Barton and Hamrick's attorney a letter, by certified mail, stating that arrangements could not be facilitated. The letter indicated that the Lab would take the two samples for testing to the University of Minnesota veterinary lab on July 8. The letter was not timely received because the July 2 mailing date, combined with the July 4 weekend, left inadequate time for appellees to appeal the decision or accompany the samples. With regard to the Copeland sample, the Livestock Show informed Weldon Copeland, Kevin's father, that it would not submit the remaining sample from Kevin's steer for further testing.

---

[10] The FFA chapters at the Exhibitors' schools were placed on probation because of the positive drug tests.

7

In late July, the Minnesota lab conducted an ELISA and an HPLC test of the samples from the Barton and Hamrick lambs. The tests revealed that Barton's lamb had no lasix in its system, while Hamrick's lamb again tested positive. In late August, the Copeland specimen arrived at a lab in Germany, where it was tested for clenbuterol.[11] This test proved negative. In September as a result of the second round of testing, the Livestock Show reinstated Barton and Copeland as winners and distributed their auction proceeds. Hamrick, however, remained disqualified.

The publicity surrounding the disqualifications began on June 5, before the second round of testing. The Livestock Show issued a press release stating that eight animals from the show had tested positive for unauthorized substances. The article did not reveal the names of the disqualified exhibitors or associated schools; however, the article indicated the breeds and placement in the competitions. Following the press release, various newspapers around the state published the story. A summary of the publicized information follows: (1) the Livestock Show press release, dated June 5, delineating the eight animals, by category, that were disqualified; (2) an Associated Press article reprinted in Dallas Morning News and San Angelo Standard Times, dated June 7, paraphrasing Leroy Shafer, Livestock Show publicist, as saying the disqualifications would teach a lesson, and "if these drugs had been found in a shipment of meat, the whole load would have been tossed out and the owner fined or imprisoned"; (3) a Houston Chronicle article, dated June 23, in which Steve Woodley, Livestock Show Assistant Manager, is quoted as saying: "I think they [appellees] know how the animals got the drugs, I just don't think they are willing to admit it"; (4)

---

[11] The record does not indicate the reason for selecting the German lab; however, at least two Texas labs proved inadequate for clenbuterol testing.

a Livestock Show press release, dated September 23, announcing reinstatement of previously disqualified contestants, explaining that drugs were not found in "quantities to completely validate the first test;" and (5) a letter from the Livestock Show to Copeland's high school, dated September 24, stating that "drug quantities were not found in quantities to completely validate the first test."

The procedural history of the case spans more than ten years and the record is extensive. Appellees originally filed this action against the Livestock Show and William Grusendorf, San Saba Independent School District superintendent, on August 19, 1991, in San Saba County.[12] On September 30, the Livestock Show moved to transfer venue, arguing that: (1) the Livestock Show should be sued in Harris County, where it maintains its principal place of business; (2) the alleged causes of actions did not occur in San Saba County; (3) appellees complain about the actions of Jay Eudy, a director of the TEA, a state agency located in Travis County, in which case section 15.014 of the civil-practices-and-remedies code would mandate venue in Travis County, *see* Tex. Civ. Prac. & Rem. Code Ann. § 15.014 (West 2002); and (4) no mandatory or permissive exception authorizes the maintenance of the action in San Saba County.[13] Appellees responded that San Saba County was proper venue because: (1) the Livestock Show had the required minimum

---

[12] The original plaintiffs to the action were the Hamricks and the Bartons. Copeland intervened as a plaintiff on April 14, 1993, after the cause was transferred to Travis County.

[13] Originally, appellees sought an injunction preventing Grusendorf from complying with Eudy's order to place Hamrick on probation and restrict her FFA activities. No allegations were leveled specifically against Eudy or the TEA. Responding, the Livestock Show sought to transfer venue, arguing that appellees complained of Eudy's and the TEA's activities. The Livestock Show argued that because appellees prayed for an injunction affecting the actions of Eudy, such an injunction "would be in the nature of a mandamus," thus requiring venue in Travis County. *See* Tex. Civ. Prac. & Rem. Code Ann. § 15.014 (West 1997). Appellees then named Eudy and the TEA as defendants because Eudy ordered Hamrick's probation. Appellees asserted that the probation violated Hamrick's due process by not providing her a hearing and administrative remedy.

contacts with the county, (2) damages accrued there, (3) Grusendorf was a resident of the county, and (4) Eudy was not a party to the suit.

In an amended motion, the Livestock Show reurged its earlier arguments and also stated that it could not obtain a fair trial in San Saba County. In support, the Livestock Show submitted affidavits of San Saba County residents. Appellees submitted affidavits to the contrary. Following appellees' joinder of Eudy and the TEA as defendants and an agreement to transfer venue to Travis County, the district court granted the Livestock Show's motion and transferred the action to Travis County in September 1992.

After the transfer, appellees again amended their petition to join the Lab, John Reagor, the Lab's head of toxicology, and the Texas A&M University System Board of Regents ("A&M") as defendants. Appellees alleged that Reagor was negligent in testing the animals, and under the doctrine of *respondeat superior*, the Lab and A&M were liable for his negligence. On March 22, 1993, Reagor, the Lab, and A&M moved to transfer venue from Travis County to Brazos County, arguing that the Texas Tort Claims Act mandates venue in the county where the events, here the drug testing, occurred. *Id.* § 101.102 (West 1997) ("A suit under this chapter shall be brought in state court in the county in which the cause of action or a part of the cause of action arises.").

Copeland intervened as a plaintiff with allegations similar to those of Hamrick and Barton. The defendants moved to strike his intervention, arguing that Copeland's allegations arose out of a separate and distinct drug test of his steer. Additionally, they argued that Copeland's intervention would unduly complicate the action and that denial of Copeland's intervention would not bar him from pursuing an independent suit. On June 10, the Livestock Show filed a second

10

motion to transfer venue and an original answer with regard to Copeland's plea in intervention. In this motion, the Livestock Show argued that either Brazos or Harris County afforded proper venue, not Travis County.[14] On June 29, the trial court denied the motions to strike Copeland's plea in intervention. The district court overruled the motions to transfer venue on April 14, 1994. On May 6, the district court dismissed the causes of action against the TEA. Appellees nonsuited Eudy on September 15, thus ending the involvement of any Travis County defendant.

On May 26, 1995, the district court granted the Livestock Show partial summary judgment with regard to appellees' DTPA claims on the ground that appellees were not "consumers" as defined by the DTPA. Tex. Bus. & Com. Code Ann. § 17.45(4) (West 2002). Additionally, the court ordered that appellees take nothing with respect to their action for conversion and intentional infliction of emotional distress. On June 16, the court severed the DTPA claims from the conversion and infliction-of-emotional-distress claims. Appellees then appealed the DTPA summary judgment. This Court reversed the summary judgment and remanded the cause to the district court. *Hamrick v. Houston Livestock Show & Rodeo, Inc.*, No. 03-95-00467-CV (Tex. App.—Austin April 17, 1996, no writ) (not designated for publication) ("*Hamrick I*").

On June 7, 1999, the Livestock Show moved for partial summary judgment on the issues of libel, defamation, false light, and malice. The district court granted summary judgment on the false-light issue and denied the motion as to the remaining issues.

---

[14] The Livestock Show argued that Brazos County was the proper venue because the drug testing was conducted at the Lab in Brazos County. Alternatively, the Livestock Show maintained that its principal place of business, Harris County, was the proper venue and that Copeland had not asserted any facts supporting venue in Travis County.

11

Before trial, the Livestock Show moved to exclude the testimony of appellees' expert Dr. Steven Barker, who presented his opinions as to the Lab's faulty testing methods and procedures. The Livestock Show asserted that Barker had not tested his theory, that the theory had not been subjected to peer review, and that it was not generally accepted in the scientific community. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). The court overruled the motion. Following a December 2000 trial, the district court rendered judgment in favor of appellees and against the Livestock Show for approximately $1.5 million.[15] The Livestock Show appeals, asserting sixteen issues.

## II. Discussion[16]

### A. Venue

By its sixteenth issue, the Livestock Show argues that Travis County was not the proper venue. With appellees' agreement, the San Saba County district court transferred the action to Travis County. Following the transfer, appellees named Reagor, the Lab, and A&M as defendants, who then moved that venue be transferred to Brazos County. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.102 ("A suit under [the act] shall be brought . . . in the county in which the cause of action or a part of the cause of action arises."). The Travis County district court overruled

---

[15] At trial, the jury found the following in favor of appellees: (1) $300,000 in mental anguish damages; (2) $115,000 in injury-to-reputation damages; (3) $12,020 for Leslie Hamrick's loss of prize money; (4) $190,000 in attorney's fees for trial and appeal; and (5) $630,000 in additional DTPA damages.

[16] The Livestock Show's first issue inquires: "Does public policy favor the enforcement of the Houston Livestock Show's drug testing program?" Because public policy is not a basis upon which to assign error or, standing alone, for this Court to reverse a trial court, we will not address this issue.

the motion. Appellees then nonsuited Eudy and the TEA, the only Travis County defendants. The Livestock Show moved for rehearing of its motion to transfer venue, arguing that Harris County was proper venue; Reagor, the Lab, and A&M moved for rehearing of their motion to transfer venue to Brazos County. The district court overruled both motions.

The Livestock Show argues that once Eudy and the TEA were dismissed, the reason for mandatory venue in Travis County ceased to exist and its motion for rehearing should have been granted. The Livestock Show contends that venue was mandatory in either Brazos or Harris County at the time of the dismissals, because appellees complained about the tortious actions of the Lab, A&M, and Reagor, which implicate the Texas Tort Claims Act's mandatory-venue provision. *Id*. Additionally, the Livestock Show argues that venue would have been proper in Harris County as its principal place of business, that "[t]he causes of action upon which this suit is based did not accrue in Travis County," and that "[appellees] never asserted any facts supporting venue in Travis County."

Appellate review of venue decisions is governed by section 15.064(b) of the civil-practice-and-remedies code, which provides:

> On appeal from the trial on the merits, if venue was improper it shall in no event be harmless error and shall be reversible error. In determining whether venue was or was not proper, the appellate court shall consider the entire record, including the trial on the merits.

*Id*. § 15.064(b) (West 2002). If there is any probative evidence in the entire record that venue was proper in the county where judgment was rendered, the appellate court must uphold the trial court's determination. *Ruiz v. Conoco, Inc.*, 868 S.W.2d 752, 758 (Tex. 1993). If there is no such evidence,

13

the judgment must be reversed and the case remanded to the trial court. *Id.* Such error cannot be harmless. *Id.* Texas Rule of Civil Procedure 87(5) states:

> If venue has been sustained as against a motion to transfer, or *if an action has been transferred to a proper county in response to a motion to transfer*, then *no further motions to transfer shall be considered* regardless of whether the movant was a party to the prior proceeding or was added as a party subsequent to the venue proceeding, *unless* the motion to transfer is based on the grounds that an impartial trial cannot be had under Rules 257-259 or on the ground of mandatory venue, provided that such claim was not available to the other movant or movants.

Tex. R. Civ. P. 87(5) (emphasis added).

There are few cases involving rule 87(5). In *Dorchester Master Ltd. Partnership v. Anthony*, the trial court initially denied a defendant's motion to transfer venue. 734 S.W.2d 151, 152 (Tex. App.—Houston [1st Dist.] 1987, orig. proceeding). The court later, *sua sponte*, ordered venue transferred and vacated its earlier order. *Id.* On petition for writ of mandamus, the court of appeals held that the express provisions of rule 87(5) precluded such an action once venue had been sustained. *Id.*

In *U.S. Resources, Inc. v. Placke,* the trial court first sustained a motion to transfer venue. 682 S.W.2d 403, 404 (Tex. App.—Austin 1984, orig. proceeding). However, the court later granted a motion to reconsider and denied the transfer. *Id.* The plaintiffs petitioned this Court for a writ of mandamus, offering rule 87(5) as one of the reasons why the court's reconsideration of the motion to transfer was void. *Id.* at 405. We held that rule 87(5) did not apply because the trial court had not actually *transferred* venue at the time the court considered the motion to reconsider. *Id.* Our opinion implies that, had the action "actually" been transferred to another venue, the express

14

language of rule 87(5) would have precluded the court from reconsidering the order sustaining the first motion to transfer venue. *Id.*

The original transfer from San Saba County to Travis County came as a result of the Livestock Show's motion, albeit with the consent of appellees. Although the Livestock Show had pleaded alternatively that the action should be transferred to either Travis County or Harris County, it did not complain of the transfer to Travis County. We hold that rule 87(5) precludes a second change of venue and overrule the Livestock Show's sixteenth issue.

## B. Copeland's Claims and the Statute of Limitations

By its second issue, the Livestock Show argues that: (1) Copeland's claim, as a matter of law, is barred by limitations; (2) "the trial court erred in submitting Copeland's claim over objection and in granting Copeland's discovery-rule post-trial trial amendment"; and (3) there is "no evidence or factually insufficient evidence to support the jury's answer" as to the date of Copeland's discovery of harm. To support its contentions, the Livestock Show argues that limitations began to run on April 1, 1991, when Copeland received the disqualification notice. "All of his alleged damages, consisting of mental anguish and reputation damages, stemmed from the disqualification," the Livestock Show contends. Therefore, the date of Copeland's intervention in the suit, April 14, 1993, was more than two years after accrual of any damages and beyond the allowable limitations period.

Question 5 asked the jury to determine "[b]y which date should Kevin Copeland, in the exercise of reasonable diligence, have discovered all the unconscionable acts or false, misleading, or deceptive acts or practices or failures to comply with a warranty of [the Livestock Show]?" The

15

jury answered "January 1, 1992." Because the alleged violations had not fully accrued on the date Copeland received his notice of disqualification, the date on which Copeland "should have known" was a question of fact properly within the province of the jury. *See Houston Endowment Inc. v. Atlantic Richfield Co.*, 972 S.W.2d 156, 160 (Tex. App.—Houston [14th Dist.] 1998, no pet.).[17]

A claim under the DTPA is subject to the act's two-year limitations provision:

> All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice.

Tex. Bus. & Com. Code Ann. § 17.565 (West 2002). The DTPA incorporates the discovery rule. *Id.*; *Burns v. Thomas*, 786 S.W.2d 266, 267 (Tex. 1990). The discovery rule is an exception to the general rule that a cause of action accrues when facts come into existence that authorize a claimant to seek a judicial remedy. *Robinson v. Weaver*, 550 S.W.2d 18, 19 (Tex. 1977). Under the rule, the statute of limitations does not begin to run until the claimant discovers, or in the exercise of reasonable diligence should have discovered, the facts establishing a cause of action. *Burns*, 786 S.W.2d at 267.

When the facts are not disputed, the question of when a cause of action accrues is a question of law. *Loyd v. ECO Res., Inc.*, 956 S.W.2d 110, 126 (Tex. App.—Houston [14th Dist.] 1997, no writ). But when a plaintiff knew or should have known of an injury generally is a question of fact. *Houston Endowment*, 972 S.W.2d at 160; *see also National W. Life Ins. Co. v. Rowe*, 86

---

[17] We will later discuss the continuing nature of the Livestock Show's DTPA violations.

S.W.3d 285, 298 (Tex. App.—Austin 2002, pet. filed). A party seeking to avail itself of the discovery rule must plead the rule, either in its original petition or in an amended or supplemental petition in response to defendant's assertion to the defense as a matter of avoidance. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988). The party seeking to benefit from the discovery rule bears the burden of proving and securing favorable findings thereon. *Id.*

On February 28, 2001, after the verdict, Copeland asked for and received permission for a post-trial amendment to his pleadings, pleading the discovery rule. The Livestock Show objected, arguing that the amendment was improper and that the discovery rule did not apply because limitations began to run on April 1, 1991. Although the Livestock Show does not specifically argue abuse of discretion, the Livestock Show did not offer any evidence of surprise or prejudice. Moreover, Copeland offered evidence at trial, without objection, indicating that some of the alleged DTPA violations were not discoverable until after the date of disqualification.

A trial court has no discretion to refuse a post-trial amendment of pleadings unless the opposing party presents evidence of surprise or prejudice, or the amendment asserts a new cause of action or defense and the opposing party objects to the amendment. *Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990). The decisions of the trial court granting or denying a trial amendment may not be overturned on appeal except upon a showing of abuse of discretion. *Hardin v. Hardin*, 597 S.W.2d 347, 349-50 (Tex. 1980); *Celotex Corp., Inc. v. Gracy Meadow Owners Ass'n, Inc.*, 847 S.W.2d 384, 387 (Tex. App.—Austin 1993, writ denied); *Missouri-Kan.-Tex. R.R. Co. v. Alvarez*, 703 S.W.2d 367, 370 (Tex. App.—Austin 1986, writ ref'd n.r.e.). A trial court abuses its discretion when it acts in an unreasonable and arbitrary manner, or without reference

17

to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). This Court may not reverse for abuse of discretion merely because we disagree with the decision of the trial court. *Id*. at 242. On this record, we cannot say that the district court abused her discretion in granting the post-trial amendment. As a result, Copeland both pleaded and obtained a jury finding regarding the discovery-rule issue.

The Livestock Show also challenges the legal and factual sufficiency of the evidence to support the jury's answer as to the date of Copeland's discovery of the harm. When reviewing a no-evidence challenge, we consider all the evidence in the light most favorable to the judgment, making every reasonable inference in its favor. *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998). We will uphold the jury's finding if more than a scintilla of evidence supports it. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). The evidence supporting a finding is more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *Id.* When reviewing a factual-sufficiency challenge, we consider all the evidence and uphold the jury's verdict unless we find that (1) the evidence is too weak to support the finding or (2) the finding is so against the overwhelming weight of the evidence as to be manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The Livestock Show argues that the date the jury selected as the date Copeland should have discovered the alleged DTPA violations, January 1, 1992, was arbitrary. It argues that there is no evidence or factually insufficient evidence "that Copeland suddenly discovered his injury" on that date. But the jury was not asked when Copeland discovered his injury, only when was the latest date he *should* have discovered it.

18

The evidence adduced at trial regarding Copeland's claim is legally and factually sufficient to support the jury's finding. After the date of Copeland's disqualification, April 1, 1991, Copeland's father, Weldon Copeland, sent a letter dated April 29 to Steve Woodley, the Livestock Show's assistant manager, requesting that the Copeland sample be sent to "another mutually accepted lab for further testing." The letter referenced an earlier telephone conversation with Woodley, confirming that the two "would agree upon a mutually acceptable lab." On May 9, the Livestock Show's attorney responded, stating that "[t]he [Livestock Show] is not willing to have the sample retained by it . . . sent for further testing at this time." Conversely, on April 11 and 29, Barton and Hamrick, who had retained counsel, received letters stating that the Livestock Show was willing to retest the samples from their animals at an agreed upon lab. Weldon Copeland testified that following these events, he and Woodley again agreed to send the sample to another lab for testing. However, before they had decided upon a lab, the Livestock Show sent the sample to the German lab without the Copelands' knowledge. The other alleged DTPA violations in the record occurring *after* Copeland's disqualification involved numerous press releases and comments in the press, detailed above, and statements to the Exhibitors' school administrators by the Livestock Show and its employees. The events at issue began with the disqualification and continued at least into August 1991 when the sample from Copeland's steer was sent to Germany. The jury was asked whether the Livestock Show engaged in any (1) unconscionable course of action, (2) false or misleading or deceptive practice, or (3) failure to comply with a warranty. The jury answered in the affirmative as to all appellees, including Copeland.

19

We cannot say that January 1, 1992, only a little over four months after Copeland's steer's urine sample was sent to the German lab and a little over three months after the Livestock Show finally awarded the prizes, is an unreasonable date for Copeland to have been aware that the Livestock Show's actions toward him violated the DTPA. Considering all of the evidence as we must, *see Westech Engineering, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ), we hold that the evidence was legally and factually sufficient to support the finding.

In any event, any error by the jury was harmless. Copeland intervened in the action on April 14, 1993, well within two years of the Livestock Show's final activities giving rise to Copeland's DTPA claim. We overrule the Livestock Show's second issue.

## C. The Parents as Consumers Under the DTPA

By its third issue, the Livestock Show argues that the appellee parents are not consumers for purposes of the DTPA and that there is no evidence or factually insufficient evidence to support their status as consumers. The Livestock Show contends that "[t]he basis of [appellee parents'] complaint is the drug testing performed by the Diagnostic Lab, [and] [t]hat is not a valid basis for a claim against the [Livestock Show] under the DTPA." The Livestock Show argues that the parents sought, acquired, or purchased nothing from the Livestock Show that could form the basis of the complaint and that they were not exhibitors in the show. This Court has previously held that all appellees were consumers under the DTPA. *Hamrick I* at *6. The Livestock Show, however, argues that under the "law of the case" doctrine, this Court could not have rendered judgment on the

20

issue as a matter of law, as appellees assert, because appellees filed no cross-motion for summary judgment on the issue.[18]

The DTPA mandates liberal construction to promote the underlying purpose of the act. Tex. Bus. & Com. Code Ann. § 17.44 (West 2002). A "consumer" under the DTPA is defined as "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires, by purchase or lease, any goods or services." *Id.* § 17.45(4). To qualify as a consumer, the plaintiff must meet two requirements: (1) the person must seek or acquire goods or services by purchase[19] or lease and (2) the goods or services purchased or leased must form the basis of the complaint. *Sherman Simon Enters., Inc. v. Lorac Serv. Corp.*, 724 S.W.2d 13, 14 (Tex. 1987); *see also* Tex. Bus. & Com. Code Ann. § 17.45(2) (West 2002) ("'Services' means work, labor, or service purchased or leased for use . . . ."). The word "purchase," in the context of the DTPA, has been defined as the actual transmission of services from one person to another by voluntary act or agreement, founded on valuable consideration. *Hall v. Bean*, 582 S.W.2d 263, 265 (Tex. Civ.

---

[18] The law-of-the-case doctrine is the principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages. *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986). The doctrine operates to narrow the issues in successive stages of litigation and is supported by policy goals of uniformity of decisions and judicial economy. *Id.* The doctrine does not necessarily apply if the issues and facts are not substantially the same in the subsequent trial. *Id.* As such, use of the law of the case is flexible, left to the discretion of the court, and determined on a case-by-case basis. *Med Ctr. Bank v. M.D. Fleetwood*, 854 S.W.2d 278, 283 n. 6 (Tex. App.—Austin 1993, writ denied).

[19] "To accept the construction . . . that only direct purchasers can be consumers, would be to read additional or different language into the DTPA, in contravention of the Act's mandate of liberal construction. The legislature could easily have drafted such a restriction into the definition of 'consumer,' for example, by use of the words 'purchaser or lessee,' but did not do so." *Kennedy v. Sale*, 689 S.W.2d 890, 892 (Tex. 1985) (employee who received heath care benefits from employer-selected plan was consumer).

21

App.—Beaumont 1979, no writ). A plaintiff's standing as a consumer is established by its relationship to the transaction, not by a contractual relationship with the defendant. *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983). Whether a plaintiff is a consumer under the DTPA is a question of law for the trial court. *Holland Mortgage & Inv. Corp. v. Bone*, 751 S.W.2d 515, 517 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

We need not decide whether the law-of-the-case doctrine applies because the district court determined as a matter of law that the parents were consumers, and the evidence adduced at trial supports such holding. The parents were involved in the entire animal-showing process. The parents signed waivers of liability, which approved the Livestock Show's right to test the animals for unauthorized drugs. They also signed a notarized form stating that they would abide by the Livestock Show rules and that no illegal substances had been administered to the animals. Additionally, when an Exhibitor's animal was subjected to drug testing, an Exhibitor's parent witnessed the taking of the sample, after which the parent signed another form acknowledging that the parents witnessed the event. The parents, as well as the Exhibitors, were subject to the threat of a lifetime banishment from future shows in the event of a disqualification resulting from illegal drug use. The myriad of services that the Livestock Show provided to the Exhibitors and their parents included the use of the facilities for their children, animal judging, drug testing, and the auction. Simply stated, the Exhibitors could not have entered the competition without their parents' express joinder and participation. We hold that the district court was correct in concluding the parties were consumers because (1) the parents did seek or acquire the services of the Livestock Show, indicated by their authorization, participation, and potential exclusion from all future shows; and (2) the

22

services provided by the Livestock Show form the basis of the complaint. We overrule the Livestock Show's third issue.

## D. The Existence of DTPA Violations

By its fourth issue, the Livestock Show argues that it did not commit any DTPA violations. More specifically, the Livestock Show claims that: (1) there was no unconscionable conduct or false, misleading, or deceptive act or practice and (2) there was no warranty or breach of warranty. The jury found to the contrary. Generally, the Livestock Show contends that there was no evidence or factually insufficient evidence to support the jury's findings on these issues.

The Livestock Show argues that any unconscionable act or misrepresentation that took place after the appellees paid the entry fee is not covered by the DTPA.[20] "Unconscionable" refers to:

an act or practice which, to a person's detriment:

(A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

Act of May 10, 1977, 65th Leg., R.S., ch. 216, § 1, 1977 Tex. Gen. Laws 600, 600 (amended 1995) (current version at Tex. Bus. & Com. Code Ann. § 17.45(5) (West 2002)). Additionally, the act

---

[20] The applicable version of the DTPA is determined by the date the deceptive act or practice occurs. *La Sara Grain v. First Nat'l Bank*, 673 S.W.2d 558, 565 (Tex. 1984) (citing *Woods v. Littleton*, 554 S.W.2d 662, 666 (Tex. 1977)). The events surrounding the disqualification occurred in 1991. We will apply the law in effect at that time.

delineates circumstances under which a consumer can maintain an action for its violation. Former section 17.50(a) states that "[a] consumer may maintain an action where any of the following constitute a producing cause of actual damages: . . . (3) any unconscionable action or course of action by any person." Act of May 16, 1979, 66th Leg., R.S., ch. 603, § 4, 1979 Tex. Gen. Laws 1327, 1329 (amended 1995) (current version at Tex. Bus. & Com. Code Ann. § 17.50(a) (West 2002)).

The Livestock Show argues that the entire transaction was completed when appellees paid the entry fee, and any "post-transaction statements or act" are beyond the scope of the DTPA. The Livestock Show's definition of the transaction is too narrow. The transaction did not begin and end with appellees' payment of the entry fee. Instead, the transaction included the payment of the fee and the host of services that the appellees purchased. These services included, but were not limited to, the competition, judging, prizes, auction, auction proceeds, and the animal drug testing. The transaction was on-going from the time appellees submitted their entry forms until the final drug testing and distribution of prizes.

The supreme court, in an early consumer-protection-act case, stated that "the date of the acts which give rise to the cause of action under the Consumer Protection Act [the DTPA predecessor], rather than the date of the sale, determines the applicability of the Act." *Woods v. Littleton*, 554 S.W.2d 662, 666 (Tex. 1977). In *Woods*, the Woodses purchased a home on November 10, 1972, which was *before* the act's effective date of May 21, 1973.[21] *Id*. at 664. Within

---

[21] In addition to purchasing the home, the court held that the Woodses purchased the "services" of the builders, if repairs were necessary in the first year. The deceptive trade practice committed by the builder arose out of this contract for services.

a month they experienced sewer and septic problems. *Id.* After a series of repairs, representatives of the homebuilder represented that the sewer system was in good working order. *Id.* The jury found that this representation was made *after* the act became effective. *Id.* at 665. This statement proved false, and the Woodses sued to recover for deceptive practices under the act. *Id.* at 664. One question facing the court was whether there had been a violation of the consumer-protection act because the purchase of the home and the services occurred before the act became effective. The supreme court stated that because the consumer-protection violation had occurred *after* the act had become effective, recovery was possible, despite the fact the sale had taken place before the act's effective date. *Id.* at 665.

In *Flenniken* the supreme court reinforced its holding that deceptive trade practices—"unconscionable" actions in violation of section 17.50(a)(3)—can occur following the initial transaction. 661 S.W.2d at 707 (citing Act of May 23, 1977, 65th Leg., R.S., ch. 216, § 5, 1977 Tex. Gen. Laws 600, 603 (current version at Tex. Civ. Prac. & Rem. Code Ann. § 17.50(a)(3) (West 2002))). The Flennikens entered into a mechanic's and materialman's lien contract for the construction of a home. *Id.* at 706. Through a series of events, the contractor assigned the Flennikens' note and contract lien to the bank for a commitment to provide interim construction financing. *Id.* The contractor, after receiving four disbursements of construction funds, abandoned the project. *Id.* The bank foreclosed and sold the home, whereupon the Flennikens sued the bank for violating the DTPA. *Id.* The bank argued that the Flennikens were not "consumers" under the act, but the court disagreed. *Id.* The court further noted that "[u]nder § 17.50(a)(3) there is no

requirement that the defendant's unconscionable act occur simultaneously with the sale or lease of the goods or services that form the basis of the consumer's complaint." *Id.* at 707.

More recently, this Court has considered the same issue. *See Teague v. Bandy*, 793 S.W.2d 50, 54 (Tex. App.—Austin 1990, writ denied). There, the buyers of nonpossessory interests in a cow, its unborn calf, and the cow's future embryo transfers, sued for the sellers' violations of DTPA, alleging misrepresentation of the facts surrounding the auction sale. *Id.* at 53. The district court found that the sellers had misrepresented the facts, and that there was an unconscionable gross disparity between the value that the buyers received and the consideration they had paid. *Id.* at 54. In summarizing the sellers' argument on appeal, this Court wrote: "[i]n sum, appellants urge that the facts are to be evaluated as of the date of the auction." *Id.* The sellers argued that there was no misrepresentation as of the date of the sale, no evidence that there was a gross disparity between the consideration paid and the value received as of the date of the sale, and therefore no damages. *Id.* Responding, this Court held: "[t]he facts as of the date of the deceptive practice, not necessarily the date of sale, determine the applicability of the DTPA." *Id.* (citing *Woods*, 554 S.W.2d at 667). This Court further noted:

> There is no requirement, for example, that the unconscionable act occur simultaneously with the sale that forms the basis of the complaint. If in the context of the transaction any person engages in an unconscionable course of action that adversely affects the consumer, that person is subject to liability under the DTPA.

*Id.*; *see also Hines v. Evergreen Cemetery Ass'n*, 865 S.W.2d 266, 269 (Tex. App.—Texarkana 1993, no writ) (fact that defendant's practices or acts occur after sale of goods or services will not preclude consumer status); *Galveston County Fair & Rodeo, Inc. v. Kauffman*, 910 S.W.2d 129, 138

(Tex. App.—El Paso 1995, writ denied) ("[r]eview of a finding of unconscionability requires an examination of the *entire* transaction.") (emphasis added).

Relying on *Chastain v. Koonce*, the Livestock Show argues that "for an act to be unconscionable, it must be extreme and occur as part of the original transaction." 700 S.W.2d 579, 584 (Tex. 1985). In *Chastain*, the purchasers of five rural homesteads sued vendors, alleging unconscionable action in violation of DTPA. *Id.* at 580. The purchasers offered evidence at trial demonstrating that the vendors had told the purchasers that only lot number one of fifteen would be for commercial use. *Id.* Additionally, the purchasers' deed restrictions limited the lots' use to single-family dwellings. *Id.* Several months after the purchasers had constructed homes on their lots, defendants sold lot number two to a purchaser who constructed an oilfield pipe storage yard on the property. *Id.* The owner of lot number four began steps to purchase lot number three to ensure that it remained residential. *Id.* At trial, plaintiff testified that during his efforts to purchase lot number three, one defendant had threatened him physically, while remarking that he would place something "real nice" on lot number three. *Id.*

In determining whether defendants acted in an unconscionable manner, the court held that the evidence in the record must show that the "[t]aking advantage of a consumer's lack of knowledge to a grossly unfair degree . . . requires a showing that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Id.* at 584 (citing Act of May 19, 1995, 74th Leg., R.S., ch. 414, § 3, 1995 Tex. Gen. Laws 2988, 2989 (current version at Tex. Bus. & Com. Code Ann. § 17.45(5))). The court noted that the plaintiff's evidence of the defendant's phone threats made after the sale and associated misrepresentation were insufficient. *Id.* Specifically, the

27

court held that "[t]he phone conversation occurred approximately *one year* after the alleged misrepresentations occurred and do not reflect on the unfairness of the original transaction." *Id*.

The present case is distinguishable from *Chastain.* Here, the alleged DTPA violations took place during the course of appellees' receiving their services. The animal drug testing occurred after the contest judging and auction; however, it occurred before the Livestock Show paid the contestants their awards and auction proceeds. Furthermore, even after the Livestock Show declared the appellees disqualified, it proceeded to test the remaining half of the urine samples to confirm the initial results. These two tests and the final disposition of the awards and prize money constituted a part of the original agreement for services that the Livestock Show agreed to provide in exchange for the entry fee. The events spanned the period from December 1990, the date the appellees signed their entry forms, to September 1991, the date of the appellees' final award disposition. In *Chastain* all events surrounding the purchase of the residential lots had been completed approximately one year before the telephone conversation occurred. By that time, the plaintiffs already had built homes on their lots, and the alleged unconscionable conduct evinced by the telephone threat could not be considered additional evidence of unfairness in the original purchase of the land.

The Livestock Show also relies on *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995). In *Parkway*, plaintiffs purchased a lot and home from the previous owner. *Id.* at 436. Plaintiffs alleged that as the result of the developer's subsequent construction activities, the lot's drainage patterns changed, resulting in flooding and property damage. *Id.* at 437. Plaintiffs argued that the developer violated the DTPA by breaching an implied warranty to perform future services, and, in the alternative, that the developer committed an unconscionable act. *Id.* Plaintiffs prevailed

28

at the district court; however, the supreme court reformed the judgment to delete any recovery under the DTPA. *Id.* at 437, 445.

The supreme court held that the only possible transaction under which plaintiffs could assert their claim of breach of implied warranty and unconscionability was the sale of the lot from the developer to the homebuilder, not the sale of the home to plaintiffs. *Id.* at 439. The court, however, stated that there was "no reasonable basis under these facts for concluding that [the developer] impliedly agreed to perform future development services for [the plaintiffs'] benefit"; therefore, the breach of implied warranty claim was without merit. *Id.* Examining the unconscionability allegation under the same transaction, the court stated that "unconscionability requires that the seller take advantage of special skills and training *at the time of the sale*." *Id.* (citing *Chastain,* 700 S.W.2d at 584).

*Parkway* is distinguishable from the case before us because the supreme court held that the alleged DTPA violations occurred in a transaction that did not involve the plaintiffs. The *Parkway* transaction occurred over three years before the plaintiffs purchased the home and over five years before the property damage occurred. Here, the applicable transaction is between the Livestock Show and appellees, and there is no significant passage of time from the date of contest entry, which is the date the services were purchased, and the beginning of the alleged DTPA violations.[22]

---

[22] The appellees signed and returned the entry forms to the Livestock Show in December 1990. The competition occurred in February and March 1991, and the Exhibitors were disqualified that March. Discussions about a "mutually agreeable" testing lab between the parents and the Livestock Show occurred in April. The initial press release occurred in June. Finally, two of the three Exhibitors were reinstated, after the second drug test, in September.

Furthermore, the *Parkway* court held that "no services were included in the transaction, [and thus] no service-related warranty was breached." *Id*. at 440. The case before us, however, concerns the sale of services, which were not completed at the time of sale and, in fact, were not completed until final determination of disqualification of the Exhibitors and disbursement of awards.

From the evidence before it, the jury could reasonably believe that the Livestock Show acted in an unconscionable manner with regard to appellees. Therefore, we hold that the evidence of the Livestock Show's unconscionable conduct throughout the course of the entire transaction is ample, under any test, to uphold the jury verdict. The evidence adduced at trial indicated that the Livestock Show disqualified the Exhibitors based on faulty testing information, an unproven test, and arguably suspect procedures before the split-samples were tested and before the appellees could offer any explanation. Connie Hamrick testified that she pleaded with Livestock Show officials to let her family prove its innocence, and that she discovered the existence of the split-sample not from the Livestock Show but from the Bartons. Jacque Barton testified that Woodley informed her that she would have to sue to have the split-sample tested. Further, the Livestock Show later informed the Bartons and Hamricks that the split-sample would be sent to a mutually agreeable lab for testing. Later, the Livestock Show unilaterally sent the split-samples to the Minnesota lab for testing. The Livestock Show told Weldon Copeland that it would not test the Copeland split-sample. Lynn Hamrick informed the Livestock Show that a positive lasix test could result if electrolytes were given to the animal. He also testified that Hamrick's lamb had been given electrolytes, which are not a banned substance.

30

Additionally, the jury considered evidence about erroneous disqualifications for positive drug test results that occurred at an earlier San Angelo stock show the same year. The Lab administered the drug tests to the San Angelo animals as well. Dr. Gary Hodges, veterinarian and San Angelo Stock Show President, testified as to the high number of false-positive drug tests in lambs at the show. He recounted that he created an experiment to test the Lab's testing process, and that the results, obtained in June 1991, demonstrated that the Lab's methods were suspect. Jacque Barton testified that she informed Woodley about Hodges's experiment that same month. Appellees presented evidence that on June 21, 1991, the San Angelo Stock Show reinstated all disqualified exhibitors due to the potential for false-positives generated by the testing procedures and other factors. Further, evidence showed that the Lab sent the remaining San Angelo samples to the Minnesota lab for testing, requesting that it use the same methods the Lab used at its Texas facility. Following the results of these tests, the Lab requested that the Minnesota lab use the Lab's methods in testing Hamrick's and Barton's lambs. Hamrick's lamb tested positive and Barton's negative for lasix as a result of the Minnesota tests. The jury heard evidence concerning the Lab's suspect clenbuterol-testing procedures performed for the Livestock Show and that only one page of the unique procedure could be located.

Appellees also presented evidence indicating that the Lab sent the attorney for the Hamricks and Bartons a letter stating that it was unable to send the samples to the lab they had proposed; instead it was sending the samples to Minnesota on July 8, 1991. The attorney was told that the parties could accompany Woodley to Minnesota, at their own expense. However, knowledge of this proposal did not reach appellees before the samples were sent to Minnesota, preventing any

response from appellees. The letter was mailed on Tuesday July 2, two days before the July 4 holiday and the July 6 and 7 weekend. Additionally, Weldon Copeland testified that he received no notice that the Copeland sample was being sent to a German lab for testing until after the fact.

Finally, appellees presented evidence that the Livestock Show released information to the press that identified the Exhibitors indirectly through descriptions of their animals. Various state newspapers picked up the story about the disqualifications. Moreover, evidence was introduced that Livestock Show officials were critical of the Exhibitors' actions, which at that time had not been verified by a second test. This evidence contained statements that the drug-laced meat would not be fit for human consumption, when testimony revealed that the USDA had tested Copeland's steer and Hamrick's lamb and found no drug residue. This evidence is sufficient to support the jury's findings of unconscionability and misrepresentation. The Livestock Show argues that there was no breach of warranty. However, our holding that the evidence was sufficient to support a finding of unconscionable, false, misleading, and deceptive practices renders such a review unnecessary. We overrule the Livestock Show's fourth issue.

**E. Producing Cause of Damages**

By its fifth issue, the Livestock Show also attacks the legal and factual sufficiency of the evidence supporting the jury's implicit finding that the Livestock Show's acts were a producing cause of appellees' damages. Viewing only the previously discussed evidence supporting the jury findings, the various actions taken by the Livestock Show were the direct producing cause-in-fact of appellees' damages. The initial drug testing, disqualification, retesting, and press releases

32

were "an efficient, exciting, or contributing cause" of the alleged damages. Tex. Bus. & Com. Code Ann. § 17.50(a). We overrule the Livestock Show's fifth issue.

## F. The Legal and Factual Sufficiency of the Actual Damages

The Livestock Show challenges the legal and factual sufficiency of the evidence supporting the actual damages awarded under the DTPA. *See* Act of May 19, 1995, 74th Leg., R.S., ch. 414, § 3, 1995 Tex. Gen. Laws 2988, 2992 (amended 1995) (current version at Tex. Bus. & Com. Code Ann. § 17.50 (West 2002)). Specifically, the Livestock Show argues that the evidence is legally and factually insufficient to support the award of: (1) mental anguish damages (issue seven); (2) prize money and auction proceeds to Leslie Hamrick (issue eight); and (3) injury to reputation (issue six).

### 1. Mental-Anguish Damages

By its seventh issue, the Livestock Show challenges the legal and factual sufficiency of the mental-anguish award. The jury awarded T.L. and Connie Hamrick $25,000 each and Leslie Hamrick $50,000 in mental-anguish damages. Craig and Jacque Barton each received $25,000 and Jimmy Barton received $50,000 in mental-anguish damages. Kevin Copeland received $100,000 in mental-anguish damages. The Livestock Show contends that there was no evidence or factually insufficient evidence to support these damages.

"An award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing that there was a substantial disruption in [their] daily routine." *Parkway*,

33

901 S.W.2d at 444. We apply traditional no-evidence standards to determine whether the record reveals any evidence of "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger' to support any award of damages." *Id.* (quoting *J.B. Custom Design & Bldg. v. Clawson*, 794 S.W.2d 38, 43 (Tex. App.—Houston [1st Dist.] 1990, no writ)). Direct evidence may be in the form of the parties' own testimony, that of third parties, or that of experts. *Id.* The evidence also must justify the amount awarded. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Although the impossibility of any exact valuation requires that juries be given a measure of discretion in finding damages, that discretion is limited. *Id.* A jury must find an amount that "would fairly and reasonably compensate" for the loss; however, "juries cannot simply pick a number and put it in the blank." *Id.*

Leslie Hamrick testified that on many occasions she was confused and sick to her stomach over the incident and from explaining the events to others. She also testified that "sometimes at school . . . I would be in the restroom, and I would cry." Leslie testified that she experienced additional embarrassment and nausea when she explained the events surrounding the disqualification to her employer. Connie Hamrick, after undergoing surgery for a brain aneurism, stated that her migraine headaches increased in frequency and were caused by "stress and worry" about the incident. She also testified that she was sick to her stomach, lost sleep, and that she "worried [herself] until physically ill." Lynn Hamrick testified that he was humiliated and had "knots" in his stomach when he offered to resign from the school board, an offer that was not accepted. He also testified that he quit attending chamber-of-commerce meetings because he did not "feel like [he] could face those people."

Jacque Barton testified that she often cried, did not go to stock shows anymore, and lost interest in starting planned businesses. She also testified that she did not eat or sleep when she thought of the disqualification. Craig Barton testified that he and Jacque were consumed with the disqualification. He stated that he was "overlooking everything else" in his life, not sleeping well, and that his daily routine "all but stopped." He testified that the family's self-esteem was completely taken away and that the negative effects still remain in his business dealings. Jimmy Barton testified that after the disqualification he had "a few sleepless nights, some loss of appetite," and knots in his stomach. Jacque testified that Jimmy's grades suffered because of the incident and that she had to consult with his teachers regarding this drop in performance.

Kevin Copeland testified that he was scared when questioned by the Food and Drug Administration investigators, and that at the annual FFA banquet, where he was expecting awards, he received none unlike past years. This he attributed to the disqualification from the Livestock Show, and said this explained his leaving the banquet before its conclusion. He also testified that the disqualification affected his stomach, made him want to stay away from people, and that the news was "in his head at all times." Weldon Copeland testified that after the disqualification, Kevin was irritable, did not want to go to school, and no longer rose early to take care of his animals.

We hold that appellees presented legally and factually sufficient evidence of compensable mental anguish.

Appellees also must have presented evidence to justify the amount awarded. *Saenz*, 925 S.W.2d at 614. In *Saenz* the supreme court held that there must be evidence that the amount of

35

damages awarded by the jury for mental anguish was fair and reasonable but acknowledged that such

determination is often difficult:

> There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding. Reasonable compensation is no easier to determine than reasonable behavior–often it may be harder–but the law requires factfinders to determine both. And the law requires appellate courts to conduct a meaningful evidentiary review of those determinations.

*Id*.

In *Bentley v. Bunton*, the supreme court reviewed a mental-anguish award of $7

million, holding that it was excessive and without support in the evidence. 94 S.W.3d 561, 607

(Tex. 2002). With regard to appellate review for evidentiary support of noneconomic damages, the

court wrote:

> Just as a jury's prerogative of assessing the credibility of evidence does not authorize it to find liability when there is no supporting evidence or no liability in the face of unimpeachable evidence, so a large amount of mental anguish damages cannot survive appellate review if there is no evidence to support it, or a small amount of damages when the evidence of larger damages is conclusive. The jury is bound by the evidence, just as it is bound by the law.

*Id*. at 606. Citing *Saenz*, the *Bentley* court concluded that it has "rejected the view that [the authority

for appellate review of insufficient evidence] displaces [an appellate court's] obligation, and ours,

to determine whether there is any evidence at all of the *amount* of damages determined by the jury."

*Id.* Recognizing that reasonable compensation is not easy to determine, we conclude that there is

36

sufficient evidence in the record to support the amount of appellees' award for mental anguish, and that such amount was fair and reasonable.[23]

The jury heard testimony from each of the appellees as to the disruption in their lives and the personal toll taken by the events surrounding their disqualification. Additionally, evidence was introduced detailing the punishment that the Livestock Show imposed on the appellees—lifetime banishment from the largest stock show in Texas. An award of $100,000 for each family is fair and reasonable and not out of proportion to the other awards meted out by the jury. In addition to mental-anguish damages, the jury awarded appellees $115,000 for injury to reputation. The ratio of appellees' mental-anguish damages to their injury-to-reputation damages is far lower than the ratio of damages in *Bentley*.[24] *Id.* at 607 (ratio of mental-anguish award to loss-of-reputation award greater than 40 to 1).[25] The ratio of appellees' mental-anguish damages to injury-to-reputation damages ranged from a low of 2.5 to 1 to a high of 5 to 1, a ratio that we find

---

[23] In *Saenz*, the supreme court concluded that there was no evidence to support the jury's $250,000 award for mental-anguish damages, considering that the only evidence found in the record was one question and one answer, which indicated that Saenz worried and that she believed she and her husband might lose their home and that they could not afford the medical bills. *See Saenz v. Fidelity & Guar. Ins.*, 925 S.W.2d 607, 614 (Tex. 1996).

[24] The ratio of mental-anguish damages to damages for injury-to-reputation is as follows: Leslie Hamrick, Jimmy Barton, and Kevin Copeland: 2.5 to 1; Craig Barton: 1.25 to 1; T.L. and Connie Hamrick and Jacque Barton: 5 to 1. Additionally, the ratio of Leslie Hamrick's mental-anguish damages to the award of her prize money is about 2 to 1.

[25] Courts often rely on a ratio of damages to establish whether noneconomic or actual damages are excessive. *See Tatum v. Preston Carter Co.*, 702 S.W.2d 186, 188 (Tex. 1986) (remittitur of actual damages does not require reduction of exemplary damages by same proportion); *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981) (exemplary damages must be reasonably proportioned to actual damages, but there is no set ratio); *Southwestern Inv. Co. v. Neeley*, 452 S.W.2d 705, 707-08 (Tex. 1970) ("It has long been the law in Texas that the amount of exemplary damages should be reasonably proportioned to the actual damages found.").

reasonable in relation to their other damages. From this record, it is certain that the jury did much more than "simply pick a number and put it in the blank." *See Saenz*, 925 S.W.2d at 614.

Moreover, the jury was asked to consider an award for appellees' future mental anguish and future injury to reputation, but it awarded no damages to any appellee on these issues. *See Schindler Elevator Corp. v. Anderson*, 78 S.W.3d 392, 415 (Tex. App.—Houston [14th Dist.] 2001, pet. granted, judgm't vacated w.r.m.) (award of some damages and not others indicates that jury "measured carefully" damages issue). We hold that the jury's award was a fair and reasonable amount of compensation for appellees' mental anguish. *Cf. Casteel v. Crown Life Ins. Co.*, 3 S.W.3d 582, 593 (Tex. App.—Austin 1997), *rev'd on other grounds*, 22 S.W.3d 378 (Tex. 2000) ("[N]othing in the record shows that the award . . . is *fair and reasonable compensation* for that anguish."). We overrule the Livestock Show's seventh issue.

## 2. Leslie Hamrick's Award of Prize Money

By its eighth issue, the Livestock show challenges the legal and factual sufficiency of the jury's award of Leslie Hamrick's prize money. The jury awarded Leslie Hamrick $12,020 for her loss of prize money and auction proceeds. Arguing against the award, the Livestock Show cites the fact that Hamrick's lamb tested positive on both drug tests. In accordance with the Livestock Show rules, a positive drug test results in disqualification. Hamrick argues that "[s]ince Dr. Barker proved from [the Lab's] own data that the substance in the Hamrick lamb was not lasix, it can reasonably be inferred that a competent referee lab would have also exonerated [Hamrick]." Further, Hamrick contends that "[e]vidence also supports the conclusion that [Hamrick] would never have

38

had to forfeit her prize money in the first place if [the Livestock Show] had not submitted her lamb's urine sample for testing by methods so new they were incorrectly performed."

Dr. Steven Barker, appellees' expert, testified that in his opinion "neither [Hamrick's nor Barton's lamb's] samples contained Lasix." In explaining the basis of his opinion, Barker testified that he compared the information on the Lab's urine test HPLC printouts, that were introduced into evidence, to the calculations he performed using the same data. Barker concluded that the substance in Hamrick's and Barton's lambs could "not possibly be Lasix." Additionally, the jury heard evidence from Reagor about the Lab's testing of electrolytes with an ELISA test, which generated a positive result similar to lasix, as well as the positive result using the HPLC. The jury also heard testimony concerning the Lab's efforts to have the urine samples tested at the Minnesota lab. As the sole judge of the witnesses' credibility, the jury was entitled to reconcile the differences in the witnesses' testimony. *Simons v. City of Austin*, 921 S.W.2d 524, 531 (Tex. App.—Austin 1996, writ denied). Therefore, although Hamrick's lamb tested positive on both the Lab's and the Minnesota lab's drug tests, the evidence adduced at trial is sufficient to support the jury's award of damages to Hamrick. We overrule the Livestock Show's eighth issue.

### 3. Injury to Reputation

By its sixth issue, the Livestock Show challenges the legal and factual sufficiency of the injury-to-reputation award. The jury awarded a total of $115,000 to appellees for past injury to their reputations.[26] This jury question was a part of Question 16, which included all the damage-

---

[26] The individual damages are as follows: (1) Leslie Hamrick: $20,000; (2) T.L. and Connie Hamrick: $5,000 each; (3) Jimmy and Craig Barton: $20,000 each; (4) Jacque Barton: $5,000; and

award questions, except the additional-damages question submitted because the jury found the Livestock Show knowingly committed the unconscionable act. The Livestock Show argues that the award is solely recoverable under a defamation cause of action, which Jimmy Barton and Leslie Hamrick submitted to the jury. Copeland did not request jury questions regarding defamation. The jury's answer to whether the Livestock Show acted with malice was negative as to both Barton and Hamrick. Thus, the Livestock Show contends that "[d]amages for alleged loss of reputation are not recoverable under any other theory, including DTPA." Appellees rejoin that because the applicable DTPA provisions provide for "actual damages," which include all common-law damages, damages for injury to reputation are appropriate.

Under the DTPA provisions in effect at the time appellees brought this action, appellees could seek "the amount of actual damages" caused by the Livestock Show's false, misleading, or deceptive conduct. Act of May 16, 1979, 66th Leg., R.S., ch. 603, § 4, 1979 Tex. Gen. Laws 1327, 1329 (amended 1989 & 1995) (current version at Tex. Bus. & Com. Code Ann. § 17.50(b)(1)). The amount of actual damages recoverable is "the total loss sustained as a result of the deceptive trade practice." *Arthur Andersen v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997) (citing *Kish v. Van Note*, 692 S.W.2d 463, 466 (Tex. 1985)). "[T]he DTPA embraces this concept by permitting the injured consumer to recover the greatest amount of actual damages alleged and factually established to have been caused by the deceptive practice . . . ." *Kish*, 692 S.W.2d at 466.

---

(5) Kevin Copeland: $40,000.

40

Actual damages are those damages recoverable under the common law.  *Id.* (citing

*Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 939 (Tex 1980)).  At common law,

actual damages are either "direct" or "consequential."  *Id.* (quoting *Henry S. Miller Co. v. Bynum*,

836 S.W.2d 160, 163 (Tex. 1992) (Phillips, C.J., concurring)).  Direct damages are the necessary and

usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong.  *Id.*

Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been

foreseen by the defendant from its wrongful act.  *Id.*

Consequential damages result naturally, but not necessarily, from the defendant's

wrongful acts.  *Id.* (citing *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex.

1995)).  Under the common law, consequential damages need not be the usual result of the wrong,

but must be foreseeable and must be directly traceable to the wrongful act and result from it.  *Id.*

Foreseeability is not an element of producing cause under the DTPA.  *Id.*  However, if damages are

too remote, too uncertain, or purely conjectural, they cannot be recovered.  *Id.*  Consequential

damages are classed as special damages and must be specifically pleaded.  Tex. R. Civ. P. 56;

*Bynum*, 836 S.W.2d at 164 (Phillips, C.J., concurring).

Appellees' injury-to-reputation damages are recoverable as actual damages under the

DTPA.  Injury to reputation is a measure of the damages recoverable under the common law cause

of action for defamation.  *Renfro Drug Co. v. Lawson*, 160 S.W.2d 246, 248 (Tex. 1942) (civil

statute for libel incorporated common-law definition, which included "to injure . . . the reputation

of one alive"); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 1997) (elements of libel

include "tends to injure a living person's reputation"); *Leyendecker & Assocs., Inc. v. Wechter*, 683

41

S.W.2d 369, 374 (Tex. 1984). Therefore, injury-to-reputation damages are a *measure* of actual damages for unconscionable conduct and do not require pleading defamation for recovery. Injury to reputation is a consequential damage under the common law because the Livestock Show could have foreseen the consequences of wrongfully disqualifying the Exhibitors. *Perry Equip.*, 945 S.W.2d at 816. Appellees properly submitted a specific question concerning their injury to reputation, and each obtained a favorable finding. Disqualifying the Exhibitors based on questionable drug tests without first testing the split-samples, refusing to test the samples at a mutually agreeable facility, and publishing the disqualification in various state newspapers and to the Exhibitors' schools and organizations, among other actions, provided ample evidence that the Livestock Show could and should have foreseen injury to appellees' reputations. We overrule the Livestock Show's sixth issue.[27]

## G. The Jury's Finding of a Knowing Violation

By its ninth issue, the Livestock Show argues that there is no evidence or factually insufficient evidence to support the jury's finding of a knowing violation of the DTPA and its award of additional damages. The jury awarded each appellee $90,000 in additional damages, based on a finding that the Livestock Show "knowingly" violated the DTPA. *See* Act of May 16, 1979, 66th

---

[27] By its twelfth issue, the Livestock Show challenges the jury finding that the Livestock Show made defamatory statements with regard to Leslie Hamrick and Jimmy Barton. Because we sustain the district court's award of injury-to-reputation damages, we need not and do not address this issue.

Leg., R.S., ch. 603, § 4, 1979 Tex. Gen. Laws 1327, 1330 (current version at Tex. Civ. Prac. & Rem. Code Ann. § 17.50(b)(1)).

The supreme court has held that a knowing violation occurs when the offending party has "actual awareness" of the deception:

> "Actual awareness" does not mean merely that a person knows what he is doing; rather, it means that a person knows that what he is doing is false, deceptive, or unfair. In other words, a person must think to himself at some point, "Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway.

*St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53-54 (Tex. 1998). The DTPA authorizes the trier of fact to award not more than three times the amount of actual damages in excess of $1000 if the defendant's violations of the DTPA are committed knowingly. Act of May 16, 1979, 66th Leg., R.S., ch. 603, § 4, 1979 Tex. Gen. Laws 1327, 1330.

Our review of the record reveals ample evidence of a knowing violation. Jacque Barton testified that when she asked for the split-sample to be tested, Woodley told her that she would have to sue. Weldon Copeland received a letter relaying that the Livestock Show was not willing to retest the Copeland sample, after the Livestock Show had told the attorney for the Bartons and Hamricks that the Livestock Show was willing to retest their samples. Further, the Livestock Show's actions regarding the submission of the samples to the Minnesota and German labs, without timely informing the appellees, was also before the jury. The Livestock Show consistently misled appellees as to its intentions with regard to testing the split-samples, making it impossible for appellees to participate in or monitor the tests. The evidence is sufficient to support a finding of a knowing DTPA violation. We overrule the Livestock Show's ninth issue.

43

## H. Additional DTPA Damages Award

By its tenth issue, the Livestock Show argues that the additional-damages award is not recoverable because there was no knowing DTPA violation. Because the trier of fact affirmatively found that the Livestock Show acted with knowledge, an award of up to three times the actual damages was proper. *See id.* The jury found actual damages in the amount of: (1) $300,000 for past mental anguish; (2) $115,000 for injury to reputation; (3) $12,020 for Hamrick's prize and auction proceeds; and (4) $190,000 for attorney's fees. Excluding the attorney fees, the actual damages amounted to $427,020. The jury's award of $630,000 is not greater than three times the actual damages, and the trier of fact was within its discretion in making this award. We overrule the Livestock Show's tenth issue.

## I. Attorney's Fees

By its eleventh issue, the Livestock Show challenges the award of attorney's fees. The Livestock Show argues that "[appellees] failed to segregate their attorney's fees testimony and judgment award by party and cause of action," and that the award for appellate attorney's fees should have been made contingent upon the success of any appeals.

The Livestock Show argues that much of appellees' action involved the pursuit of claims that did not provide for attorney's fees and the pursuit of other parties that were dismissed before trial. Specifically, the Livestock Show argues that appellees: (1) "brought this case against seven defendants, asserting multiple distinct causes of action"; and (2) claims of "negligence, gross negligence, intentional infliction of emotional distress, conversion, and defamation" are actions that do not provide for attorney's fees. Appellees argue that segregation is not required because the

44

multiple claims arose out of the same facts and transaction, requiring the same proof against both the parties. Therefore, appellees claim the fees are inseparable.

Attorney's fees are available when a statute or contract permits such an award. *Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996); *Grace v. Duke*, 54 S.W.3d 338, 343 (Tex. App.—Austin 2001, pet. denied). The general rule is that when a plaintiff seeks to recover attorney's fees in a case where there are multiple defendants, and one or more of those defendants have made settlements, the plaintiff must segregate the fees owed by the remaining defendants from those owed by the settling defendants so that the remaining defendants are not charged fees for which they are not responsible. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10-11 (Tex. 1991). Similarly, when a plaintiff seeks to recover attorney's fees in a case involving multiple claims, at least one of which supports an award of fees and at least one of which does not, the plaintiff must offer evidence segregating attorney's fees among the various claims. *Id.* However, an exception to this duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts. *Id*. Thus, a plaintiff must either segregate the fees among the several claims and parties or establish that the claims are sufficiently interrelated. *Id*. The proper remedy for a failure to segregate is to remand the case to the trial court. *Id*. at 12. Whether fees can be segregated between various claims and parties is a question for the court. *Aetna Cas. & Sur. v. Wild*, 944 S.W.2d 37, 41 (Tex. App.—Amarillo 1997, writ denied).

The appellees were entitled to attorney's fees for their DTPA cause of action only. *See* Tex. Bus. & Com. Code Ann. § 17.50(d). Appellees' attorney, Richard Miller, testified that he

made an agreement with appellees when he took the case from their previous lawyers that he would attempt to recover all of the attorney's fees at trial.[28] When questioned concerning the obligation to segregate, Miller stated that after reviewing the previous two lawyers' bills, he "was unable to arrive at the opinion that this is an appropriate case to segregate attorney's fees according to causes of action and parties." Miller testified that he could not segregate as to claims and parties because "all of the claims arise out of the same set of facts; that is, the disqualification . . . [t]hat is the common thread running through all claims and causes of action against any of the defendants, and it applies to all of the plaintiffs." The district court, over the Livestock Show's objection, did not require appellees to segregate attorney's fees with respect to the claims or parties. Appellees' attorney was cross-examined by both the Livestock Show's and the Lab's attorneys. The cross-examination was limited to asking appellees' attorney to confirm the following: (1) some defendants originally named in the suit had been dropped and that only two remained at trial, (2) suit against the Lab, a governmental entity, required additional work to address the problems associated with such a suit, (3) only two of the causes of action argued at trial provided for the recovery of attorney's fees, (4) appellees had dropped some causes of action they had initially pleaded, and (5) the hours on which he is basing the attorney's fees are based on the hours he spent on the entire case. Appellees' attorney agreed with these statements. Neither the Livestock Show's nor the Lab's attorney required appellees' attorney to itemize the fees regarding claims or defendants.

---

[28] The first attorney to work for appellees was Galen Moeller. Miller testified that Moeller had been paid $6000 by appellees. William Hall followed Moeller. Miller testified that Hall accumulated 396.25 hours at $150.00 per hour for a total of $59,437.

46

During his testimony and closing argument, appellees' attorney argued that the appropriate attorney's fees in the case would be the following: (1) for preparation, trial, and past appeal: $150,000; (2) for future appeal to the court of appeals: $25,000; and (3) for appeal to Supreme Court of Texas: $15,000. Jury Question 17 asked: "[w]hat is a reasonable fee for the necessary services of Plaintiffs' attorneys in this case incurred in prosecution of the claims in Questions 1, 2, and 3, stated in dollars and cents?" Questions 1, 2, and 3 concerned the DTPA violations against the Livestock Show and not the negligence issues directed at the Lab or the defamation issue directed against the Livestock Show. The Lab objected to Question 17, but the Livestock Show did not. The fees requested by appellees' attorney were exactly the amount the jury awarded in Question 17 and the amount in the final judgment. Thus, under the judgment the Livestock Show is liable to pay the entire attorney's fee award because the jury's answers resulted in a take-nothing judgment against the Lab. After examining the record and considering the nature of the DTPA, contract, negligence, and defamation claims as well as the various parties and their time involved in the suit, we conclude that appellees' prosecution of the claims necessitated proof of essentially the same facts. Thus, the district court was correct in not requiring segregation of attorney's fees.

The Livestock Show argues that there "was no evidence or factually insufficient evidence of the specific amount attributable to Plaintiff's DTPA claim," and to support the "judgment of $150,000 for attorney's fees for preparation for trial and past appeals to the court of appeals." We disagree. The evidence appellees presented at trial and detailed above is sufficient to

47

support the jury's award of attorney's fees. Moreover, the Livestock Show did not object to the submission of Question 17 before the district court charged the jury.

The Livestock Show also contends that the jury's award of $25,000 for appellate-court review and $15,000 for supreme-court review is improper because this award is not conditioned upon success. A trial court may award appellate attorney's fees, but it may not penalize a party for taking a successful appeal by taxing that party with attorney's fees. Because an unconditional award of appellate attorney's fees is improper, the trial court must make the award of attorney's fees to an appellee contingent upon the appellant's unsuccessful appeal. *Chilton Ins. Co. v. Pate & Pate Enters.*, 930 S.W.2d 877, 896 (Tex. App.—San Antonio 1996, writ denied); *Smith v. Smith*, 757 S.W.2d 422, 426 (Tex. App.—Dallas 1988, writ denied). As to its eleventh issue, we overrule the Livestock Show's argument that the attorney's fees should have been segregated. We sustain the Livestock Show's eleventh issue as to the award of appellate-court attorney's fees and reform the district court's judgment so that the award is expressly contingent upon the ultimate success of appellees.[29]

## J. The *Daubert* Issue

By its fourteenth and fifteenth issues, the Livestock Show argues, *inter alia*, that appellees' expert witness, Dr. Steven Barker, presented opinions concerning the drug testing

---

[29] By its thirteenth issue, the Livestock Show argues that the Lab was not negligent or grossly negligent. The jury's affirmative finding as to the Lab's negligence and gross negligence is not required to uphold the judgment concerning the violations of the DTPA. Therefore, we need not address the Livestock Show's thirteenth issue.

procedures that were unsupported in scientific literature. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997). Moreover, the Livestock Show contends that Barker's testimony was "not relevant or reliable." The basis for an expert's testimony is that it "should be shown to be reliable before it is admitted." *Gammill v. Jack Willams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). The trial court, in discharging its duty as gatekeeper, must determine how to assess the reliability of particular testimony. *Id*. There must be some basis to show the reliability of the opinion offered. *Id*. The criteria for assessing reliability will vary depending on the type of expert and the nature of the evidence. *Id*. at 726-27. In some cases, an expert's experience alone may provide a sufficient basis for such testimony. *Id*. at 726. The trial court has broad discretion in determining admissibility of an expert's testimony, and we will reverse only if the trial court abuses that discretion. *See Robinson*, 923 S.W.2d at 556-57. We gauge abuse of discretion by whether the trial court acted without reference to any guiding rules or principles. *Id*. at 558. This Court may not reverse for abuse of discretion merely because we disagree with the decision of the trial court. *Id*.

The Livestock Show attacks Barker's opinion testimony regarding the drug tests and specific methods the Lab used to test the Exhibitors' animals' samples. Specifically, the Livestock Show contends that Barker's "opinions have no support in the literature or the court." Barker testified that he holds a Ph.D. in chemistry and is the director of three Louisiana State University chemical testing facilities, including the state racing commission, which tests race horses for illegal drug use. Barker stated that he had been a director for the racing commission lab since 1987. As such, Barker also testified that he had personal experience with the testing equipment used by the

49

Lab. In fact, Barker testified that his labs still used the same testing equipment. Specifically, Barker testified that he had experience with the HPLC with fluorescence used in testing for lasix. On cross-examination, Barker demonstrated how the HPLC worked from an exhibit in the courtroom.

The record indicates that Barker did not offer opposing scientific theories or novel testing procedures that the Lab should have followed. Instead, Barker criticized the methodology and the type of tests used to detect lasix. Barker, from reading the Lab's HPLC printouts, testified that in his opinion the substance detected was not lasix. Further, he testified that the Lab's test was inappropriate to confirm the specific substance detected. The test the Lab conducted and the test Barker proposed as a better option were tests used by Barker. Additionally, Barker testified to operating the equipment used in the Lab to test for clenbuterol. Regarding the Lab's procedure for detecting clenbuterol in Copeland's steer, Barker was faced with a unique test developed by Lab personnel, on which Barker offered his opinion as to the methods and procedures. Moreover, the Lab, upon a discovery request, could only produce the first page of the procedures for this test; the other pages were missing. Reagor, employed by the Lab, testified that this was an original test developed at the Lab and the procedure had never been published. Therefore, when Barker testified as to the alleged methods used in detecting clenbuterol, he offered criticism of the Lab's procedure not some unproven scientific method of his own.

The supreme court has held that "[t]he offering party must demonstrate that the witness "possess[es] special knowledge as to the very matter on which he proposes to give an opinion." *Gammill*, 972 S.W.2d at 718 (quoting *Broders v. Heise*, 924 S.W.2d 148, 152-153 (Tex. 1996)). Examining Barker's testimony, we hold that he did possess the requisite expertise. While

50

testifying, he demonstrated his proficiency in the area of animal drug testing and his familiarity with the Lab's lasix test. Barker, and few others, knew of the exact procedures the Lab used in detecting clenbuterol; his criticism was limited to the information obtained at discovery, prior testimony, and his own experience with methods employed by the Lab. Therefore, the district court did not abuse her discretion in allowing Barker to testify as appellees' expert. We overrule the Livestock Show's fourteenth and fifteenth issues.

### III. Conclusion

We reform the district court's judgment to provide that the court's award of attorney's fees on appeal is made expressly contingent upon the ultimate success of appellees. In all other respects, we affirm the district-court judgment as reformed.

_____

Lee Yeakel, Justice

Before Justices Kidd, Yeakel and Patterson

Reformed and, as Reformed, Affirmed

Filed:   July 24, 2003