In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-24-00213-CV
_____


ROBERT DAY, Appellant

V.

SOUTHSIDE BANK, Appellee

**On Appeal from the 411th District Court**
**Polk County, Texas**
**Trial Cause No. CIV34586**

**OPINION**

This appeal arises out of a dispute between Southside Bank and one of its

former account holders, Robert Day, who sued Southside for breach of contract,

violations of the Deceptive Trade Practices Act ("DTPA"), and unjust enrichment.[1]

---

[1]The petition states Day brought the lawsuit "individually and on behalf of all others similarly situated," but the record does not indicate the trial court certified any such class. *See* Tex. R. Civ. P. 42. The petition also identified Day's wife as a plaintiff, but she nonsuited her claims.

On appeal, Day argues the trial court erred when it granted Southside's amended motion for traditional and no-evidence summary judgment. Because Day's summary judgment response cites evidence raising a genuine issue of fact regarding each element challenged in the no-evidence motion, and because Southside's traditional motion fails to conclusively establish Southside is entitled to judgment as a matter of law, we reverse the summary judgment and remand this case to the trial court for further proceedings.

## Background

When Day opened an account with Southside in June 2020, he signed an Overdraft Services Disclosure and Consent Form which began with the explanation, "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." The disclosure informed Day that Southside authorizes and pays overdrafts for checks and automatic bill payments but does not authorize and pay overdrafts on ATM transactions and everyday debit card transactions unless the customer asks. The disclosure also informed Day that Southside "will charge you a fee of $32.00 each time we pay an overdraft." Day completed and signed the form, checking a box next to the statement "I want SOUTHSIDE BANK to authorize and pay overdrafts on my ATM and everyday debit card transactions."

2

Day later filed suit challenging Southside's practice of charging overdraft fees on "Authorize Positive, Settle Negative Transactions" (APSN Transactions). Day alleges the APSN practice worked in the following manner:

> At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Southside immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Southside has already held the funds for payment.
>
> . . .
>
> Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Southside later assesses [overdraft fees] on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

The petition asserts the practice of assessing overdraft fees on APSN transactions is unfair and deceptive, citing a publication issued by the United States Consumer Financial Protection Bureau explaining practices the Bureau discovered at another institution:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.

3

Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged.

. . .

[B]ecause consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Supervisory Highlights: Winter 2015, Section 2.3 (Deposits), *available at* https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf.

Day asserts Southside assessed multiple $32 overdraft fees on debit card transactions that were authorized while Day had a positive balance and settled when Day had a negative balance due to other account activity. Day testified in his deposition that he tried to speak with the bank about the overdraft fees, tried to contact the branch manager in Diboll, and called the office in Tyler, but "they wouldn't talk to me." On February 10, 2021, Day withdrew $600 from his account. According to Day, Southside then closed his account with an ending balance of negative $620.82, despite his request that the account remain open so he could make

4

a deposit. Day filed suit against Southside asserting three causes of action: breach of contract, unjust enrichment and violations of the DTPA.

Southside answered and filed a motion to transfer venue, and Day filed a response supported by an unsworn declaration which is mentioned here because it was subsequently used by both sides as summary judgment evidence. The declaration lists five overdraft fees that Day was charged by Southside on three dates in the fall of 2020.

After discovery, Southside filed a hybrid motion for summary judgment asserting traditional and no-evidence grounds, supported by several exhibits including the contract, the overdraft consent form signed by Day, bank statements, overdraft notices, excerpts of deposition testimony, Day's discovery answers, Day's unsworn declaration, and transcripts and recordings of Day's phone calls with Southside's representatives. Day filed a response supported by deposition excerpts, Day's discovery responses, Day's unsworn declaration, two consent orders in administrative proceedings before the CFPB, several publications issued by entities such as the CFPB, the Federal Reserve Board and the FDIC, and a copy of Southside's Consumer Account Disclosure effective 11/1/2017. The record does not indicate either party filed objections to the other's summary judgment exhibits. After a hearing, the trial court granted the motion without stating its reasons. The order

5

constitutes a final judgment dismissing with prejudice all claims asserted by Day against Southside. Day appealed.

## Standard of Review

After there has been adequate time for discovery, a party may file a motion for summary judgment asserting there is no evidence of one or more essential elements of a claim or defense on which the other party bears the burden of proof. *See* Tex. R. Civ. P. 166a(i).[2] "The motion must state the elements as to which there is no evidence." *Id*. "Once such a motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). "A trial court is not required to consider summary judgment proof to which the party does not specifically direct the court's attention." *Bustamante v. Moak Devs., LLC*, No. 09-23-00154-CV, 2025 Tex. App. LEXIS 284, at *21 (Tex. App.—Beaumont Jan. 23, 2025, no pet.) (mem. op.). A trial court must grant a no-evidence motion unless the nonmovant produces more than a scintilla of evidence raising a genuine issue of material fact as to the challenged elements. Tex. R. Civ. P. 166a(i); *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002). If the evidence rises to a level that would allow reasonable and fair-minded people to differ in their

---

[2]Rule 166a has since been amended. All references are to the version of the rule in effect at the time the motion was filed.

conclusions, then more than a scintilla of probative evidence exists. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003). "The evidence does not create an issue of material fact if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (quoting *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014)). In evaluating whether more than a scintilla of evidence exists, we must view the evidence in the light most favorable to the nonmovant. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

A party moving for a traditional summary judgment must establish that there is no genuine issue of a material fact and that the movant is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c). A defendant is entitled to summary judgment "only when the defendant negates at least one element of each of the plaintiff's theories of recovery, or pleads and conclusively establishes each element of an affirmative defense." *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997) (internal citations omitted). "A motion must stand or fall on the grounds expressly presented in the motion." *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993). "Likewise, issues a non-movant contends avoid the movant's entitlement to summary judgment must be expressly presented by written answer to the motion or by other written response to the motion and are not expressly presented by mere reference to summary judgment evidence." *Id*.

We review grants of summary judgment de novo. *Cantey Hanger, LLP v. Byrd,* 467 S.W.3d 477, 481 (Tex. 2015). When the trial court does not specify the grounds on which it granted summary judgment, we must affirm if any ground is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872-73 (Tex. 2000). When a party moves for both a traditional and no-evidence summary judgment, we typically consider the no-evidence motion first. *Ford Motor Co.*, 135 S.W.3d at 600. If the non-movant fails to meet his burden under the no-evidence motion, there is no need to address the challenge to the traditional motion because it necessarily fails. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

In our review, we take as true all evidence favorable to the non-movant, indulge every reasonable inference in favor of the non-movant, and resolve any doubts in the non-movant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). "Evidence is conclusive only if reasonable people could not differ in their conclusions[.]" *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

Analysis

## 1.     Day's Breach-of-Contract Claim

### A.     No-Evidence Motion

The no-evidence portion of Southside's motion asserts, "Plaintiff must establish in support of his breach-of-contract claim that he performed and suffered

8

actual damages that were caused by Southside. Here there is no evidence that he did or suffered damages or that Southside caused his damages."

We begin by noting that this is only a partial list of the elements of a breach-of-contract claim. Correctly stated, the elements are: "*(1) the existence of a valid contract*; (2) the plaintiff performed *or tendered performance* as the contract required; *(3) the defendant breached the contract by failing to perform or tender performance as the contract required*; and (4) the plaintiff sustained damages as a result of the breach." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018) (emphasis added). Day's response to Southside's motion correctly recites all four elements and asserts, "Southside seeks summary judgment as to the fourth element only, contending Mr. Day has not suffered damages." On appeal, Day makes the same assertion, but Southside argues that its motion also challenges the performance element.

Southside's motion asserts Day is required to "establish . . . that he performed" and "there is no evidence that he did[.]" Southside's premise is incorrect. To establish a breach of contract, it is not essential that a plaintiff prove he performed as the contract required; rather, it is essential that a plaintiff prove either that he performed or that he tendered performance. *See id*. Therefore, to present an appropriate no-evidence challenge to the performance element, a defendant must assert both that there is no evidence the plaintiff performed and that there is no

9

evidence the plaintiff tendered performance. *See* Tex. R. Civ. P. 166a(i) (no-evidence motion must challenge "one or more essential elements of a claim or defense"). Southside's motion does not do so. And because Southside did not challenge that Day tendered performance, Day was not required to respond with evidence regarding Day's performance under the contract.

Similarly, Day was not required to produce evidence Southside breached the contract, because Southside's motion contains no such challenge. Day was, however, required to respond with evidence that he "suffered damages [and] that Southside caused his damages." Day's summary judgment response asserts, "The Bank admits that it assessed APSN Fees against Plaintiff[.]" Day cites Southside's motion which states,

> On September 28, 2020, [Day] was assessed a fee in connection with a $3.00 transaction made at a Sonic Drive-In and in connection with a $134.88 purchase at Alabama Coushatta Smoke Shop. As it promised, Southside issued a notice that addressed those fees assessed on Plaintiffs account on any given day.

> The next day, [Day] contacted Southside and complained about the overdraft fees reflected on his account, which he initially believed were by incorrect, duplicate entries. Southside explained that the date on the statements reflected when the transaction settled, which was not necessarily the day [Day] used his debit card. As a courtesy, Southside agreed to refund the $32.00 overdraft fee associated with his Sonic Drive-In transaction.

Day's response to the motion also refers to the following testimony of Leigh Ann Rozell, Southside's Director of Account Services:

10

Q. . . . Does the bank know how many overdraft fees were assessed against Mr. Day's . . . account that were on debit card transactions that were authorized on a sufficient available balance but settled on an insufficient ledger balance?

A. No. We have no way to determine that just by -- without research.

Q. But if you did do research, you could determine how many of the overdraft fees that Mr. Day was assessed were on debit card transactions that were authorized on sufficient available funds but that settled on an insufficient ledger balance. Correct?

A. Yes, with research, yes.

. . .

Q. Okay. So this Sonic Drive-In debit card transaction was authorized on September 25, 2020, and it settled on September 28, 2020; correct?

A. Correct.

Q. Okay. Is there any information on this account statement about whether -- when that debit card transaction was authorized on September 25, whether it was authorized into sufficient available funds?

A. On this statement?

Q. Yes.

A. No. You could look at the prior day's balance, but the true information would be housed in Tallyho, as far as what the authorized balance would have been.

Q. And did you look into Tallyho for this transaction to see what the available balance was at the time of authorization?

A. Yes.

11

Q. And was this transaction authorized on sufficient available funds?

A. Yes.

Q. And then for this transaction, we see that the bank lists the amount of the transaction as $3; correct?

A. Yes.

. . .

Q. . . . On 10-15, there's an overdraft item fee for another Sonic debit card transaction. Do you see that?

A. Yes.

Q. And it states that it was authorized on October 14, 2020; correct?

A. Correct.

Q. Do you know if this transaction was authorized into sufficient available funds?

A. Yes.

Q. And it was?

A. Yes.

Q. On 10-15, there's another overdraft fee for a debit card transaction purchase for Fortnite that authorized on October 14, 2020. Do you see that?

A. Yes.

Q. Did this transaction authorize into sufficient available funds?

A.    Yes.

Q.    Okay. On October 16, there's an overdraft item fee for a debit card transaction with Horizon Card that was authorized on October 15, 2020. Do you see that?

A.    Yes.

Q.    Was that authorized into sufficient available funds?

A.    Yes.

Q.    Okay. Let's go to 31, Southside 31, and on 11-23 there's a paid overdraft item fee for a debit card transaction for Horizon Card that was authorized on November 19, 2020. Do you see that?

A.    Yes.

Q.    And was that authorized on sufficient available funds?

A.    I believe so.

. . .

Q.    So it is the regular practice of the bank, if a customer is opted in to overdrafts on debit card transactions, that if the debit card transaction is authorized on sufficient available funds and settles into insufficient ledger funds, an overdraft fee will be assessed.

A.    Correct.

On appeal, Southside asserts it refunded seven of the twenty-two overdraft fees shown on Day's bank statements, for a net total of fifteen non-refunded fees amounting to $480. Without conceding all such fees were the result of APSN transactions nor that assessing such fees is improper, Southside argues that none of

13

the fees are recoverable as damages because Day was "made whole" when Day used "self-help" and withdrew $600 from his account when it had a balance of $11.18, and his account was then charged a $32.00 overdraft fee and closed with a negative balance of $620.82, exceeding the amount of the non-refunded fees. Day argues that Southside's argument constitutes the affirmative defense of offset, also known as set-off.[3] But we need not decide that question, because Day's summary judgment response cites more than a scintilla of probative evidence that creates a genuine issue of material fact regarding Day's damages. When Day was asked in his deposition about the five fees identified in his unsworn declaration that was attached to his response regarding venue, he testified, "There were a lot more than that . . . I know I had at least $800 worth just in my account."

We conclude Southside's no-evidence motion properly challenges only that Day "suffered damages [and] that Southside caused his damages," and Day's response, viewed in the light most favorable to Day as nonmovant, sufficiently

---

[3]"Set-off is the doctrine of bringing into the presence of each other the obligations of A to B and of B to A, and by the judicial action of the court making each obligation extinguish the other." *Nalle v. Harrell*, 12 S.W.2d 550, 551 (1929) (citations and internal quotation marks omitted). "The right of offset is an affirmative defense. The burden of pleading offset and of proving facts necessary to support it are on the party making the assertion." *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980). An alleged right of offset is not an appropriate basis for a no-evidence summary judgment. *See* Tex. R. Civ. P. 166a(i) (limiting no-evidence motions to claims or defenses upon which the adverse party bears the burden of proof).

14

directs the trial court's attention to more than a scintilla of evidence that Day sustained damages in the form of overdraft fees assessed by Southside on transactions which were authorized on a positive available balance, but settled on a negative balance. Whether the assessment of such fees constituted a breach of contract was not an issue raised in Southside's motion. Therefore, the no-evidence portion of Southside's motion does not provide a basis for the trial court's order granting summary judgment on Day's breach-of-contract claim.

### B.    Traditional Motion

The traditional portion of Southside's motion argues Day's breach-of-contract claim is barred for two reasons. First, Southside argues that since Day impermissibly exercised "self-help" by closing his account with a negative balance in excess of the amount of the overdraft fees he was charged that were not refunded, he suffered no damages as a matter of law because his account would remain negative with or without the complained-of fees. As the party moving for summary judgment, Southside bore the burden to conclusively negate the damages element of Day's claim. As indicated above, Day testified in his deposition that he was charged overdraft fees in excess of $800. Although Southside presented evidence some of the fees were refunded and Day's account was closed with a negative balance of $620.82, Day's summary judgment response included some evidence that suggests Southside had abandoned any claim to the $620.82. In support of this point, Day's

response cites Rozell's deposition testimony agreeing that Southside wrote off the $620.82 deficit balance as "not collectible" and that Southside no longer views the negative balance as a debt that Day owes Southside. Because there is conflicting evidence of whether Day sustained damages caused by the APSN practice of Southside, we view it in the light most favorable to Day and conclude Southside failed to conclusively negate the damages element of Day's claim.

As its second basis for traditional summary judgment, Southside argues Day did not provide written notice of the allegedly improper fees as required by his contract. Day's response asserts that Southside's "reading of the contract is clearly unsupported by the plain text" and that "the language is facially inapplicable to the parties' dispute[.]" Day also argues he was not responsible to report the overdraft fees to Southside because Southside's representatives admitted in their depositions that APSN fees are not "errors" or "irregularities." Day also argues the consequence of any purported failure to provide written notice does not shield Southside from liability but merely results in the bank statements' being deemed to accurately reflect the transactions on the account, and Day is not challenging the accuracy of the transactions, only their propriety. Next, Day asserts Southside's misleading statements and deceptive practices prevented Day from identifying fees or timely reporting them. Lastly, Day asserts that because he had complained to Southside by

16

phone and in person, Southside was on notice that Day disputed the fees, and

Southside's written notice argument improperly elevates form over substance.

We begin by analyzing Day's argument that an alleged failure on his part to

comply with the contract's reporting requirements does not shield Southside from

liability. The Texas Supreme Court has explained:

> In order to determine whether a condition precedent exists, the intention of the parties must be ascertained; and that can be done only by looking at the entire contract. In order to make performance specifically conditional, a term such as "if", "provided that", "on condition that", or some similar phrase of conditional language must normally be included. If no such language is used, the terms will be construed as a covenant in order to prevent a forfeiture. While there is no requirement that such phrases be utilized, their absence is probative of the parties intention that a promise be made, rather than a condition imposed.
>
> In construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible. When the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition. Because of their harshness in operation, conditions are not favorites of the law.

*Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex.

1990) (citations omitted).

The first five sentences of the contractual provision in question, numbered and

highlighted for ease of analysis, are as follows:

> **ACCOUNT STATEMENTS**. [1] *You are responsible for* promptly examining your statement each statement period and reporting any irregularities to us. [2] Each account statement *will be considered to correctly reflect your transactions*, such as deposits, withdrawals,

17

credits, refunds, imposition of fees, interest or dividends, and other additions and subtractions to your Account, *unless you notify us in writing* within certain time limits after the statement that incorrectly reflects your transactions is made available to you. [3] *We will not be liable* for any check that is altered or any signature that is forged *unless you notify us* within Thirty (30) calendar days after the statement and the altered or forged item(s) are made available. [4] Also, *we will not be liable* for any subsequent items paid, in good faith, containing an unauthorized signature or alteration by the same wrongdoer *unless you notify us* within Ten (10) calendar days after the statement and first altered or forged items were made available. [5] You *must report* any other Account problem including encoding errors, and errors involving additions or subtractions (debits and credits) not otherwise covered herein, including electronic transactions not covered by the Electronic Fund Transfer Act, within Sixty (60) calendar days. (emphasis added).

Sentence 1 expresses a general agreement that Day is responsible to promptly examine his bank statements and report irregularities. It does not contain any language indicative of a condition precedent, nor does it indicate Southside is not liable under the contract if Day fails to comply with this reporting requirement. We conclude that sentence 1 expresses a covenant rather than a condition precedent. "A covenant, as distinguished from a condition precedent, is an agreement to act or refrain from acting in a certain way. Breach of a covenant may give rise to a cause of action for damages, but does not affect the enforceability of the remaining provisions of the contract unless the breach is a material or total breach." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) (citations omitted).

In contrast with sentence 1, each of the next three sentences uses the conditional word "unless[.]" Sentences 3 and 4 indicate Southside "will not be liable" unless Day notifies Southside within the time limits expressed in each of those sentences, but neither sentence 3 nor 4 applies here because this case does not involve a forged check nor items presented subsequent to any such check.

Like sentences 3 and 4, sentence 2 uses the word "unless[,]" but unlike sentences 3 and 4, sentence 2 does not indicate Southside "will not be liable" if Day fails to provide proper notice; instead, the consequence for failing to satisfy the condition is that the bank statement will be deemed to "correctly reflect [Day's] transactions, such as . . . imposition of fees[.]" Day concedes the overdraft fees are "correctly reflect[ed]" on the bank statements, but he asserts this does not prevent him from arguing the fees were assessed in violation of the terms of the contract. We agree with Day. "When construing a contract, the terms are typically given 'their plain, ordinary, and generally accepted meaning.' Courts may look to dictionaries to discern the meaning of a commonly used term that the contract does not define." *In re Davenport*, 522 S.W.3d 452, 456-57 (Tex. 2017) (quoting *Heritage Res., Inc. v. NationsBank, Co.*, 939 S.W.2d 118, 121 (Tex. 1996)). One dictionary defines "reflect" in this context as meaning "to make (something) manifest or apparent: show." *Reflect*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/reflect (last visited Apr. 14, 2026). We conclude that

19

although sentence 2 expresses a condition, the effect of any non-compliance is limited to the inability to challenge whether the transactions are correctly shown on the statement; that provision does not prevent Day from establishing that an overdraft fee was assessed in violation of the contract nor does it conclusively shield Southside from any such liability relating thereto.[4]

Lastly, although sentence 5 does not contain conditional language, it must be read in conjunction with sentence 2 since sentence 2 speaks of "certain time limits" which are then laid out in the next few sentences. But because sentence 5 imposes no additional consequence for failing to comply with its notice requirement, we conclude that the only consequence permitted by the contract is that which is expressed in sentence 2: the inability to challenge whether transactions such as the imposition of fees are correctly shown on the bank statements.

Having concluded that any noncompliance with the notice provisions of the contract would not preclude Day from attempting to establish that an overdraft fee that is correctly reflected on his bank statement was, nevertheless, assessed contrary

---

[4]We express no opinion regarding whether Southside's assessment of overdraft fees violates any provision of the contract. Our opinion is limited to a rejection of the issue expressly presented in Southside's motion: that Day's non-compliance with the written notice provision is "fatal" to Day's ability to bring a breach of contract claim.

to the terms of the contract,[5] we need not address Day's other arguments that granting summary judgment was improper if based on lack of written notice.

In summary, we conclude neither of the two grounds asserted in the traditional portion of Southside's motion for summary judgment provides a basis for dismissing Day's breach-of-contract claim. And because we previously concluded summary judgment was also improper on no-evidence grounds, we conclude the trial court erred when it granted summary judgment and dismissed Day's breach-of-contract claim.

## 2. Day's DTPA Claims

### A. No-Evidence Motion

Southside's motion asserts that "there is no evidence that Southside committed a wrongful act under the DTPA or that it was the producing cause of any damages [Day] allegedly suffered." Because Southside's motion asserts there is no evidence of a "wrongful act under the DTPA," Day was required to provide the trial court evidence sufficient to raise a fact issue with respect to at least one such wrongful act. The DTPA provides a cause of action for a consumer who sustains damages caused by another party's: (1) violation of section 17.46(b) that is relied on to the consumer's detriment; (2) breach of warranty; (3) unconscionable action or

---

[5]Whether Southside breached the contract was not challenged in its motion for summary judgment.

21

course of action; or (4) violation of Insurance Code chapter 541. *See* Tex. Bus. & Com. Code Ann. § 17.50(a). Day's petition alleges that Southside failed to disclose its overdraft fee practices in violation of section 17.46(b)(24), and that Southside engaged in an unconscionable action or course of action in violation of section 17.50(a)(3). For the DTPA claim to survive Southside's no-evidence motion, Day was required to point to more than a scintilla of evidence of at least one such wrongful act under either of these sections of the DTPA.

The DTPA defines an "[u]nconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id*. § 17.45(5). This definition imposes an objective standard that "requires a showing that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Chastain v. Koonce*, 700 S.W.2d 579, 583-84 (Tex. 1985).

As indicated above, Day's summary judgment response points to evidence that when a customer chooses to have overdraft protection on debit card transactions, Southside's routine practice is to charge an overdraft fee any time the account has insufficient funds in the ledger balance when the transaction is settled even if the debit card transaction was previously authorized while the account had sufficient funds in the available balance.

22

Day's response also cites evidence that Southside did not disclose this method of assessing overdraft fees to its customers. When asked about its disclosures, Southside's representative, Vonna Crowley, testified in her deposition:

Q.    Can you explain what this is?

A.    This is the disclosure that we provide to customers, as required under Regulation E, to obtain affirmative consent, as in pay over -- debit card transactions in using their overdraft privilege.

Q.    Okay. And this is a document that Southside uses for all of its customers that opt into overdraft fees on debit card transactions?

A.    Yes.

Q.    And does this document inform customers anywhere that the bank assesses overdraft fees on debit card transactions on the ledger balance at settlement?

A.    No.

Q.    And does this document anywhere inform customers that they can be assessed overdraft fees on debit card transactions that are authorized on sufficient available funds?

A.    No.

To support Day's claim that assessing fees on APSN transactions is "unfair and deceptive[,]" Day's summary judgment response relies on several government publications (to which Southside failed to object) wherein the federal agency described the APSN practice as unfair, along with two consent orders in administrative proceedings involving other banks and the United States Consumer

23

Financial Protection Bureau concluding that the assessment of such fees is an "unfair act or practice" which violates sections 1031 and 1036 of the Consumer Financial Protection Act. *See* 12 U.S.C. §§ 5531(a) and (c)(1), and 5536(a)(1)(B). One of the consent orders for Regions Bank provides the following explanation about fees on APSN transactions:

14.  During the Relevant Period, [Regions Bank] would charge an overdraft fee at settlement even if the consumer had enough money in their account when they made the purchase (i.e., Authorized-Positive Overdraft Fees).

15.  For example, a consumer starts with $100 in their checking account. The consumer makes five $10 purchases with their debit card. The next day, a $120 check that the consumer wrote posts to their account, bringing the consumer's account negative and incurring a $36 overdraft fee. On day three, the five debit-card purchases settle, and all five of them also incur overdraft fees for a total of $180 in fees— specifically Authorized-Positive Overdraft Fees—even though the consumer had sufficient funds when they made the debit-card purchases and did not know or control when the debit-card purchases would settle.

. . .

17.  Many consumers did not understand Regions' overdraft practices or how to reasonably avoid Authorized-Positive Overdraft Fees- and the Bank knew this.

18.  In a 2016 survey of [Regions'] associates, nearly seven hundred associates identified overdraft/non-sufficient funds fees as the hardest problem to resolve with consumers.

19.  Many of these associates explained that consumers checked their balance when they made a purchase but unexpectedly received

24

overdraft fees because they did not understand how the fees were assessed.

Regions Bank, CFPB No. 2022-CFPB-0008, at 7-8 (Sept. 28, 2022), available at https://files.consumerfinance.gov/f/documents/cfpb_Regions_Bank-_Consent-Order_2022-09.pdf. The *Regions Bank* Consent Order details how in 2015, 2016, 2018 and 2019, "Federal bank regulators repeatedly informed banks that various Authorized-Positive Overdraft Fees violate federal law." In another Consent Order, the CFPB concluded Wells Fargo Bank engaged in unfair acts and practices based on the following findings:

> 43. [Wells Fargo] sometimes assessed fees for Overdrafts on consumer debit card purchases and ATM withdrawals at the time that the transaction settled even if the consumer had enough funds available in their account to cover the amount of the transaction at the time they made it (transaction authorization). Overdraft fees charged on consumer debit card purchases and ATM withdrawals in such circumstances are sometimes referred to as Authorized-Positive Overdraft Fees.

> 44. Consumers may be taken by surprise when they incur Authorized-Positive Overdraft Fees because they believed that if they had enough money to cover the relevant transaction when it was authorized they would not incur an Overdraft fee. These Authorized-Positive Overdraft Fees were not reasonably avoidable because they were contrary to consumers' reasonable expectations. [Wells Fargo] implemented a process to stop charging Authorized-Positive Overdraft Fees on consumer debit card purchases in March 2022 (and is in the process of stopping charging such fees on ATM withdrawals).

Wells Fargo, CFPB No. 2022-CFPB-011, at 15 (Dec. 20, 2022), available at https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-na-2022_consent-

25

order_2022-12.pdf. Day's summary judgment response also cites testimony from Crowley's deposition:

Q.      So the bank right now is working with its core processing vendors, third parties, to figure out a way to stop assessing overdraft fees of the sort that are challenged by this lawsuit?

A.      Yes.

Q.      And why is the bank making that change or working on making that change?

A.      Mainly because we're transitioning to a $10 billion organization, and we will have to be -- we will be regulated by the CFPB. And recently the CFPB has come out to say that banks should not assess these fees -- should not assess overdraft fees on APSN transactions regardless of whether you're using available balance or you're using ledger balance. And so they shifted from, really, it being a disclosure issue, to now it's like, okay, they just say that their banks should not be charging the fee. And so because we will be regulated by them, we are working to get there, to meet their expectations.

Lastly, Day provided the trial court testimony that Day does not know how Southside processes its transactions, but "it doesn't make sense," and when he contacted Southside to complain about the overdraft fees, Southside's representatives were not responsive and eventually closed his account with a negative balance—despite his request that the account be left open due to an incoming deposit—and then reported the negative balance to a consumer reporting agency.

26

"Review of a finding of unconscionability requires an examination of the entire transaction." *Galveston Cnty. Fair & Rodeo, Inc. v. Kauffman*, 910 S.W.2d 129, 138 (Tex. App.—El Paso 1995, writ denied). "Under section 17.50(a)(3) there is no requirement that the defendant's unconscionable act occur simultaneously with the sale or lease of the goods or services that form the basis of the consumer's complaint." *Flenniken v. Longview Bank & Tr. Co.*, 661 S.W.2d 705, 707 (Tex. 1983). We find *Flenniken* instructive. There, the Flennikens contracted with Easterwood in October 1976 to construct a home on their property in exchange for which they paid Easterwood a down payment and signed a mechanic's lien note in his favor. *Id*. at 706. The note was secured by a deed of trust naming as trustee the vice-president of Longview Bank. *Id*. Contemporaneously, Easterwood assigned the note and contract lien to the bank in exchange for an interim financing commitment. *Id*. After receiving four disbursements from the bank and only completing 20% of the project, Easterwood abandoned construction. *Id*. When the Flennikens and the bank could not agree on how to resolve the matter, the bank foreclosed on the property in December 1977. *Id*. A jury found the foreclosure unconscionable, and the bank appealed. *Id*. The court of appeals reversed in part because the "foreclosure did not occur *in connection with the purchase* of the house by the Flennikens from Easterwood; rather it occurred at a subsequent date independent of the house purchase transaction." *Longview Bank & Tr. Co. v. Flenniken*, 642 S.W.2d 568, 570

(Tex. App.—Tyler 1982), rev'd, 661 S.W.2d 705 (Tex. 1983) (emphasis in original). The Texas Supreme Court reversed the court of appeals and affirmed the trial court's judgment, holding, "[T]he fact that the Bank's unconscionable course of action occurred after the Flennikens and Easterwood entered into the contract for the sale of the house does not exempt the Bank from liability under the DTPA." *Flenniken*, 661 S.W.2d at 707.

Nevertheless, Southside argues on appeal that Day's evidence does not show an unconscionable action or course of action because it "do[es] not relate to the initiation of the original transaction between Day and Southside." Southside's argument relies on three opinions which we analyze below: *Chastain*, 700 S.W.2d at 584; *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995); and *McNeely v. Salado Crossing Holding, L.P.*, No. 04-16-00678-CV, 2017 Tex. App. LEXIS 5398, at *17 (Tex. App.—San Antonio June 14, 2017, no pet.).

In *Chastain*, four couples separately purchased and built houses on four 5-acre lots based on the sellers' representations that lots 2 through 15 were restricted to residential use. 700 S.W.2d at 580. Months later, the purchaser of lot 2 built an oilfield pipe storage facility on his property, and the purchasers of lots 4, 5, 6 and 9 sued the sellers for allegedly violating the DTPA by misrepresenting the allowable use of lot 2. *Id*. At trial, Gary Chastain, who owned lot 4, testified that after the pipe storage yard was built on lot 2, he decided to purchase lot 3 to ensure it would remain

28

residential, and during those discussions, one of the defendants threatened him with physical violence if he did not stop complaining. *Id*.; *see also Koonce v. Chastain*, 674 S.W.2d 484, 485 (Tex. App.—El Paso 1984), *aff'd*, 700 S.W.2d 579 (Tex. 1985). A jury found the defendants made misrepresentations and engaged in an unconscionable action or course of action regarding the use of lot 2. *Chastain*, 700 S.W.2d at 580. Reviewing this finding for legal sufficiency, the Texas Supreme Court noted that since "the purchasers failed to show any disparity between the value received and the consideration paid in the transaction . . . [t]he only other way in which the purchasers can recover is to show that Koonce and Stroud took advantage of the purchasers' lack of knowledge, ability, or capacity to a *grossly* unfair degree." *Id.* at 582 (emphasis in original). Concluding there was no such evidence based on a review of the record as a whole, the Court then explained why the defendant's threats during negotiations over the sale of lot 3 did not constitute evidence of unconscionability in connection with the previous sales of lots 4, 5, 6 and 9:

> The purchasers emphasize the telephone conversation between Gary Chastain and J. P. Stroud, in which Stroud threatened physical violence and to place a rubber burning plant in the vicinity of Gary Chastain's land. We find this unpersuasive. The phone conversation occurred approximately *one year* after the alleged misrepresentations occurred and do not reflect on the unfairness of the original transaction between the purchasers and Koonce and Stroud. As a result, we find no evidence of unconscionability.

29

*Id*. at 584 (emphasis in original). We do not read *Chastain* to establish a rule that the DTPA's prohibition against unconscionable acts applies only to the "original" transaction between the parties. Rather, *Chastain* decided that when liability is premised on a single transaction, that transaction is not shown to be unfair with evidence that the defendant behaved badly in the context of another transaction upon which liability is not premised. In contrast to the lone transaction at issue in *Chastain*, the "original" transaction between Day and Southside served as a platform for numerous subsequent transactions, some of which resulted in Southside's assessment of overdraft fees on ATM and debit card transactions that were authorized on a positive available balance and then settled when the account had a negative ledger balance. Day's petition does not limit his allegations of unfairness to the original transaction whereby he opened his account; to the contrary, Day alleges Southside's "practice" of charging overdraft fees on APSN transactions is unconscionable, and Day seeks damages for the assessment of such fees on "transactions [plural] that did not actually overdraw the account." We find nothing in the text of the DTPA that prevents a consumer from alleging and proving that he was taken advantage of to a grossly unfair degree by a series of transactions, and in this case Day both pleaded and produced evidence that he was.

In *Parkway* there were no transactions whatsoever between the plaintiff and the defendant. Instead, in 1977 a developer (Parkway's predecessor) sold a vacant

30

lot to a builder who then built a house on the lot and sold it to the original occupants who subsequently sold it to the Woodruffs in 1981. 901 S.W.2d at 436. As a result of Parkway's ongoing development in the community, the Woodruffs' property flooded in 1983. *Id*. at 437. Dissatisfied with Parkway's proposal to resolve the issue, the Parkways installed a drainage system on their property at their own expense, but the home flooded four more times over the next few years. *Id*. A jury found Parkway negligently caused the flooding and violated the DTPA by breaching an implied warranty and by acting unconscionably. *Id*. at 438. On review, the Texas Supreme Court left intact the damages based on negligence but reformed the judgment to delete any recovery under the DTPA. *Id*. at 445. The Court noted that Parkway was not involved when the Woodruffs' purchased the home from the original occupants, and that "no contract was formed, and no goods or services were sold[]" as a result of the post-flood "negotiations" between Parkway and the Woodruffs in 1983. *Id*. at 439. Limiting its analysis to "the initial sale of the lot by Parkway to the homebuilder" in 1977, the Court concluded there was "no reasonable basis under these facts for concluding that Parkway impliedly agreed to perform future development services for the Woodruffs' benefit." *Id*. Lastly, the Court held there was no evidence to support a finding that Parkway's "advantage" in the form of "exclusive control over the drainage on the adjacent lots" was exploited "at the time of the sale of the property from Parkway to the homebuilder" in 1977. *Id*. at 440-41.

31

The case before us differs from *Parkway* for at least two reasons. First, unlike *Parkway,* which involved no transaction at all between the parties, this case involves an "original" transaction followed by numerous subsequent transactions all of which are the subject of Day's allegations of unconscionability. Secondly, the Court in *Parkway* made clear that the only transaction under analysis did not involve any future services. Here, as a result of Day's entering into the "original" transaction, Southside provided ongoing banking services to Day over the course of several months, assessing overdraft fees along the way. The banking services provided by Southside during the eight months Day's account was open are more akin to the banking transactions which took place over the course of 14 months in *Flenniken* than they are to the single-transaction sales in *Chastain* and *Parkway* which did not involve any ongoing services and were already complete when the allegedly unconscionable acts subsequently occurred.

In *McNeely*, the plaintiffs rented an apartment from the defendant. 2017 Tex. App. LEXIS 5398, at *1-2. Two years later, while the plaintiffs were in the process of moving out of the apartment, the apartment's housekeeper—acting at the direction of the manager—cleaned out the apartment and disposed of some of the plaintiffs' belongings. *Id*. at *3. When the plaintiffs confronted the manager, he initially denied knowing who was responsible. *Id*. at *4. In the ensuing lawsuit, the trial court granted the apartment complex's no-evidence motion for summary judgment which

32

was subsequently affirmed by the San Antonio Court of Appeals. While acknowledging that "there is no requirement that the defendant's unconscionable act occur simultaneously with the transaction that forms the basis of the consumer's complaint," the court nevertheless concluded that "an action or course of action is unconscionable only if it 'reflect[s] on the unfairness of the original transaction.'" *Id*. at *16 (citing *Parkway*, 901 S.W.2d at 441). The court held the McNeelys produced no evidence of an unconscionable action or course of action because "the evidence that [the manager] misstated he did not know who had entered their apartment and [the apartment complex's] delay in resolving their complaint do not reflect on the unfairness of the original transactions of leasing the apartment or renewing the lease." *Id*. at *17.

Again, the facts before us differ from those in *McNeely* in a way we consider significant. The McNeelys essentially attempted to use the manager's untruthful statement about the housekeeper's destruction of their property at the end of the lease as proof of unfairness relating back to the original transaction in which they leased the apartment. Here, Day produced some evidence that created a genuine issue of material fact that the assessment of APSN overdraft fees is, itself, unfair, regardless of whether such fees were disclosed during the original transaction. Further, we do not construe *Chastain* or *Parkway* to prevent a plaintiff from alleging and proving unconscionability based on a series of transactions or based on ongoing services

33

provided pursuant to an original transaction. The statute provides consumers a remedy for damages caused by "*any* unconscionable action or *course of action*[.]" *See* Tex. Bus. & Com. Code Ann. § 17.50(a)(3) (emphasis added). There is no language limiting the unfairness inquiry to the original transaction. Indeed, we find nothing in the text of the statute that would lead us to conclude that a consumer who may be able to prove he has been taken advantage of to a grossly unfair degree by a series of transactions or by the receipt of ongoing services should be denied relief simply because the original transaction between the parties was not grossly unfair.

We find instructive the Austin Court of Appeals' opinion in *Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555 (Tex. App.—Austin 2003, no pet.). There, the plaintiffs signed applications entering their animals in the Livestock Show, and because they won ribbons in their respective classes during the show, the animals were then sold at auction. *Id*. at 563. Before the proceeds were disbursed to the plaintiffs, the animals were tested for illegal substances. *Id*. at 563-64. When the lab reported positive findings, the Livestock Show disqualified the animals, withheld the proceeds, and banned the plaintiffs for life. *Id*. at 564-65. Other labs subsequently found no illegal substances in two of the animals, and the plaintiffs who owned those animals were reinstated as winners and received their auction proceeds. *Id*. at 565. After a jury found the Livestock Show violated the DTPA, the Livestock Show appealed, asserting an argument similar to that asserted by Southside in this case:

The Livestock Show argues that the entire transaction was completed when appellees paid the entry fee, and any "post-transaction statements or act" are beyond the scope of the DTPA. The Livestock Show's definition of the transaction is too narrow. The transaction did not begin and end with appellees' payment of the entry fee. Instead, the transaction included the payment of the fee and the host of services that the appellees purchased. These services included, but were not limited to, the competition, judging, prizes, auction, auction proceeds, and the animal drug testing. The transaction was on-going from the time appellees submitted their entry forms until the final drug testing and distribution of prizes.

*Id*. at 574. The court of appeals went on to distinguish *Chastain* and *Parkway* for the same reasons we find them distinguishable from our facts:

The present case is distinguishable from *Chastain*. Here, the alleged DTPA violations took place *during the course of appellees receiving their services*. […] The events spanned the period from December 1990, the date the appellees signed their entry forms, to September 1991, the date of the appellees' final award disposition. In *Chastain* all events surrounding the purchase of the residential lots had been completed approximately one year before the telephone conversation occurred. By that time, the plaintiffs already had built homes on their lots, and the alleged unconscionable conduct evinced by the telephone threat could not be considered additional evidence of unfairness in the original purchase of the land.

[…]

*Parkway* is distinguishable from the case before us because the supreme court held that the alleged DTPA violations occurred in a transaction that did not involve the plaintiffs. […] Furthermore, the *Parkway* court held that "no services were included in the transaction, [and thus] no service-related warranty was breached." The case before us, however, concerns the sale of *services, which were not completed at the time of sale* and, in fact, were not completed until final determination of disqualification of the Exhibitors and disbursement of awards.

35

*Id*. at 576-77 (emphasis added). Ultimately, the court of appeals held that the plaintiffs presented "evidence of the Livestock Show's unconscionable conduct *throughout the course of the entire transaction*." *Id*. at 577 (emphasis added). Similarly, we conclude Southside defines the transaction too narrowly, and we are not required to confine our inquiry to the "original" transaction in which Day opened his account. Rather, we must review the entire course of the transaction or series of transactions under which Southside provided ongoing banking services to Day. *See Norris v. Jackson*, No. 2-09-265-CV, 2010 WL 4261541, at *7 (Tex. App.—Fort Worth Oct. 28, 2010, no pet.) (mem. op.) (distinguishing *Chastain* and concluding threats made by defendant during phone call months after the "original" transaction constituted evidence that "unconscionable conduct occurred during the course of the transaction" because plaintiff had not yet received a $500 tax certificate she was promised).

Because Day pointed to more than a scintilla of evidence that Southside's actions or course of actions across multiple transactions took advantage of Day's lack of knowledge about how overdraft fees were assessed to a grossly unfair degree, we view the evidence in the light most favorable to Day and conclude Day adequately responded to Southside's assertion there was no evidence of a wrongful act under the DTPA. Southside's motion also asserts there is no evidence any wrongful act was a producing cause of damages, but we conclude otherwise for the

same reasons discussed above in the context of Day's breach-of-contract claim. Therefore, we conclude the no-evidence portion of Southside's motion for summary judgment does not support the trial court's summary dismissal of Day's DTPA claim.

### B. Traditional Motion

Southside's motion also asserts three traditional grounds for summary judgment on Day's DTPA claim. First, Southside asserts Day cannot recover damages because he exercised "self-help," leaving a negative balance when his account was closed. We reject this ground for the same reasons discussed in the context of Day's breach-of-contract claim. Secondly, the motion asserts Day failed to comply with contractual reporting provisions. Even assuming the contract's reporting requirements apply in the context of an unconscionability claim under the DTPA, we reject this argument for the same reasons discussed above in the context of Day's breach-of-contract claim. Lastly, Southside asserts Day's DTPA claim fails because although Day claims to have detrimentally relied on Southside's allegedly deceptive acts "he testified he does not remember anything about opening his account or ever reading his contract."[6] We need not address this issue because we

---

[6]Although this argument is included under the "no-evidence" heading in the motion, we include it here because Southside's motion does not list detrimental reliance among the elements of a DTPA claim, nor does it assert there is no evidence of detrimental reliance; instead, the motion recites several excerpts of Day's

have already concluded Day produced evidence of unconscionability, a wrongful act which does not require reliance. *Compare* Tex. Bus. & Com. Code Ann. § 17.50(a)(1)(B) (requiring detrimental reliance for claims based on violations of section 17.46(b)), *with* § 17.50(a)(3) (listing no such requirement for claims based on unconscionability); *see also Mays v. Pierce*, 203 S.W.3d 564, 572 (Tex. App.— Houston [14th Dist.] 2006, pet. denied) ("A plaintiff need not prove reliance to establish a claim based on unconscionability.").

Because summary judgment disposing of Day's DTPA claim was not proper based on any of the grounds asserted in Southside's motion, we conclude the trial court erred in granting the motion with respect to Day's DTPA claim.

### 3. Day's Unjust Enrichment Claim

#### A. *No-Evidence Motion*

"A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue

---

deposition testimony with which Southside attempts to negate detrimental reliance. "Because traditional and no-evidence summary judgment motions are distinct and afford distinct standards of review, we must make an initial determination regarding which type of motion was before the trial court. In making this determination, we look to the substance of the motion rather than categorizing the motion strictly by its form or title." *Gustafson v. Complete Mfg. Servs.*, No. 09-18-00415-CV, 2020 Tex. App. LEXIS 5697, at *5 (Tex. App.—Beaumont July 23, 2020, no pet.) (mem. op.) (*comparing* Tex. R. Civ. P. 166a(c), *with* Tex. R. Civ. P. 166a(i)).

advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). The no-evidence portion of Southside's motion asserts "there is no evidence that Southside obtained any benefit from Plaintiff in respect of the complained-of transactions or that any benefit was taken by fraud, duress, or [the] taking o[f] undue advantage." Day contends that Southside obtained a benefit when it assessed overdraft fees. On appeal, Southside argues there is no evidence Southside "*re*tained any benefit[,]" because "Day withdrew funds right before his account was closed that exceeded the amount of the overdraft fees[.]" (emphasis added). We have already concluded Day produced some summary judgment evidence that, when viewed in the light most favorable to Day, constitutes more than a scintilla of evidence that Southside's practice of assessing overdraft fees on APSN transactions took advantage of Day to a grossly unfair degree, and that there is a genuine issue of material fact regarding whether the fees on APSN transactions caused damages to Day. This same evidence also constitutes more than a scintilla of evidence that Southside obtained a benefit from Day by undue advantage.

### B.    *Traditional Motion*

Southside's motion also asserts two traditional grounds for summary judgment on Day's unjust enrichment claim: that Day cannot recover damages on the unjust enrichment claim because it was Day, rather than Southside, who obtained a benefit when his account was closed with a negative balance, and that Day failed

to comply with contractual reporting provisions. We reject these arguments for the same reasons discussed above in the context of Day's breach-of-contract claim.

Conclusion

Because Southside failed to conclusively establish it was entitled to judgment as a matter of law, and because Day provided the trial court more than a scintilla of evidence sufficient to raise a genuine issue of material fact regarding the elements that were challenged by Southside, we sustain Day's first and second issues asserting the trial court erred in granting Southside's motion for summary judgment on traditional and no-evidence grounds, respectively. We reverse the order granting summary judgment and remand to the trial court for further proceedings.

REVERSED AND REMANDED.

KENT CHAMBERS
Justice

Submitted on February 25, 2026
Opinion Delivered May 14, 2026

Before Johnson, Wright and Chambers, JJ.